Priority ___
Send ___
Enter ___
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

FILED
CLERK, U S DISTRICT COURT

FILED
APR 2 2 2002
4-22-02
CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

ENTERED
CLERK, U. S. DISTRIC. COURT
APR 2 4 2002
CENTRAL DISTRICT OF CALIFORNIA
B\                    DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PERFECT 10, INC.,                )
                                 )    CV 01-2595 LGB (SHx)
            Plaintiff,           )
                                 )
      v.                         )    ORDER GRANTING
                                 )    PERFECT 10'S MOTION FOR
CYBERNET VENTURES, INC.,         )    PRELIMINARY INJUNCTION
et al.,                          )
                                 )
                                 )
            Defendants           )
_____)

I.    INTRODUCTION

     This action springs from Perfect 10, Inc.'s ("Perfect 10")

allegations that defendant Cybernet Ventures, Inc. ("Cybernet"),

a corporation running a web-service called "Adult Check," and

other defendants infringe Perfect 10's copyrights, violate

Perfect 10's trademark rights and otherwise engage in rampant

unfair business practices.

     Currently before the Court is Perfect 10's Request for a

Preliminary Injunction, which requests relief against a variety

of defendants. The Court has received Perfect 10's motion,

defendants Cybernet and Laith Alsarraf's oppositions, and Perfect

10's reply. These briefs are supported by voluminous supporting

___ Docketed
___ Copies (NTC Sent)
___ JS - 5 / JS - 6
___ JS - 2 / JS - 3
    CLSD

227

1 papers (and the accompanying evidentiary objections).

2 **II.   INITIAL EVIDENTIARY OBJECTIONS**

3      In support of its motion for preliminary injunction, Perfect

4 10 submitted 117 exhibits attached to the declaration of Norman

5 Zadeh, Ph.D. ("Zadeh Decl."), 16 exhibits attached to the

6 declaration of Daniel Farmer ("Farmer Decl.") and 13 exhibits

7 attached to the declaration of Jeffrey Mausner ("Mausner Decl.").

8 Perfect 10 supplemented these declarations with several others.

9 Cybernet basically objects to every exhibit attached to the Zadeh

10 and Farmer declarations, as well as two exhibits attached to the

11 Mausner declaration. In addition Cybernet has raised objections

12 to portions of declarations filed by Zadeh, Farmer, Mausner,

13 Laurence Rudolph ("Rudolph Decl."), Selma Rubin ("Rubin Decl.")

14 and John Baruck ("Baruck Decl.").

15      Perfect 10 has also raised objections to evidence submitted

16 by Cybernet. Perfect 10 objects to a single paragraph in the

17 declaration of Timothy Umbreit ("Umbreit Decl.") and to ten

18 paragraphs in the declaration of Frederick Lane III ("Lane

19 Decl."). Before the Court makes its findings of fact under

20 Federal Rule of Procedure 65, it will address these objections.

21 It will do so, however, only in broad strokes.

22      **A.   AUTHENTICATION OBJECTIONS**

23      The great bulk of Cybernet's objections center on Perfect

24 10's exhibits printed off of the internet. See Cybernet

25 Evidentiary Objections ("Def. Obj.") at 1-5. Cybernet argues

26 these exhibits are insufficiently authenticated. <u>See, e.g.</u>, <u>id.</u>

27

28                                    2

1 │ at 1. In support, Cybernet points to two cases, United States v.

2 │ Jackson, 208 F.3d 633, 637 (7th Cir. 2000), cert. denied, 531

3 │ U.S. 973 (2000), and St. Clair v. Johnny's Oyster & Shrimp, Inc.,

4 │ 76 F. Supp. 2d 773, 774 (S.D. Tex. 1999).

5 │     The Jackson court upheld the exclusion of certain web

6 │ postings attributed to white supremacist groups because they were

7 │ insufficiently authenticated. 208 F.3d at 638. As the court

8 │ viewed the situation, the criminal defendant in the case had to

9 │ show that the postings, in which these groups appeared to claim

10 │ responsibility for a series of racist mailings, actually were

11 │ posted by the groups, as opposed to being slipped on the groups'

12 │ web sites by the defendant, who was a skilled computer user. Id.

13 │     The St. Clair court took a more extreme view over the

14 │ admissibility of data taken from the United States Coast Guard's

15 │ online vessel database concerning the ownership of a vessel. 76

16 │ F. Supp. 2d at 774. The court viewed the internet as "one large

17 │ catalyst for rumor, innuendo, and misinformation," stated that

18 │ there was "no way" the plaintiff could overcome "the presumption

19 │ that the information . . . discovered on the Internet is

20 │ inherently untrustworthy." Id. The court then excluded the

21 │ information as hearsay, rather than "relying on the voodoo

22 │ information taken from the Internet." Id.

23 │     Although these out-of-circuit cases are informative

24 │ concerning the potential pitfalls of internet-based documents,

25 │ this Court must look to the Ninth Circuit for guidance. In United

26 │ States v. Tank, 200 F.3d 627, 630 (9th Cir. 2000), the Ninth

27 │

28 │                     3

1  Circuit addressed the admissibility of certain chat room logs. In

2  Tank, the government initiated a prosecution against a child

3  pornography suspect after a search of another suspect's computer

4  files revealed "recorded" online chat room discussions among

5  members of an internet club focused on discussing, trading, and

6  producing child pornography. 200 F.3d at 629. The recorder of

7  these chat room discussions had deleted from his computer

8  nonsexual conversations and extraneous material, such as date and

9  time stamps. Id.

10      The Tank court observed that the foundational requirement of

11  authentication is satisfied by evidence sufficient to support a

12  finding that the matter in question is what its proponent claims.

13  See 200 F.3d at 630 (citing Fed. R. Evid. 901(a)). This burden is

14  met when "sufficient proof has been introduced so that a

15  reasonable juror could find in favor of authenticity." Id.

16  (citations omitted). This burden was met where the producer of

17  the logs explained how he created the logs with his computer and

18  stated that the printouts appeared to be accurate

19  representations. Id. Additionally, the government established the

20  connection between Tank and the chat room log printouts. Id.

21      The Court finds that Zadeh's declaration adequately

22  establishes the prima facie case for admissibility in claiming

23  the exhibits attached to his declaration were either:

24

25

26

27

28                                    4

1        1)    true and correct copies of documents produced by

2            Cybernet in discovery (identified by a CV prefix);

3        2)    true and correct copies of pictures from Perfect 10

4            Magazine or from Perfect 10's website; or

5        3)    true and correct copies of pages printed from the

6            Internet that were printed by Zadeh or under his

7            direction.

8

9    Zadeh Decl. ¶ 7. Those webpages that fall under category (3)

10   contain the internet domain address from which the image was

11   printed and the date on which it was printed. Id. ¶ 8.

12       The first category is covered by <u>Maljack Prods., Inc. v.</u>

13   <u>GoodTimes Home Video Corp.</u>, 81 F.3d 881, 889 n.12 (9th Cir.

14   1996)(discovery documents deemed authentic when offered by party-

15   opponent). <u>See also</u> <u>Orr v. Bank of America, NT & SA</u>, - F.3d. -,

16   2002 WL 507525 *1, *6 n.20 (9th Cir. 2002)(citing to same). The

17   second and third categories have met the *prima facie* burden

18   because the declarations, particularly in combination with

19   circumstantial indicia of authenticity (such as the dates and web

20   addresses), would support a reasonable juror in the belief that

21   the documents are what Perfect 10 says they are. <u>See</u> <u>Tank</u>, 200

22   F.3d at 630. Moreover, because computer printouts are the only

23   practical method by which the allegations of the complaint can be

24   brought before the Court and there is generally a reduced

25

26

27

28                            5

1  evidentiary standard in preliminary injunction motions,[1] the

2  Court finds that, as a general rule, Zadeh's declaration is

3  sufficient to establish the exhibits' authenticity.[2]

4      This is particularly true with regard to e-mail

5  communications attributed to Brad Estes. Mr. Estes's deposition

6  testimony establishes that it is part of his duties to respond to

7  posts in Adult Check's "webmasters lounge" and that he responds

8  to e-mails from webmasters concerning aspects of Cybernet's

9  "Adult Check" program. Mausner Decl., Ex. C at 94-97.

10     **B.    E-MAILS BETWEEN CYBERNET EMPLOYEES AND THIRD**

11          **PARTIES**

12     Cybernet does not object to the Court's consideration of the

13  communications purportedly made by Cybernet's employees "if the

14  Court were to accept Plaintiff's scanty authentication" but does

15  object to consideration of the communications attributed to third

16

17  ──────────────
       [1]See, e.g., Asseo v. Pan-America Grain Co., Inc., 805 F.2d
18  23, 26 (1st Cir. 1986)("affidavits and other hearsay materials
    are often received in preliminary injunction proceedings").
19
       [2]Perfect 10 has attempted to further elaborate on the
20  authentication issue in its Reply to Evidentiary Objections
    ("Evid. Reply") and in Norman Zadeh's Second Declaration ("Zadeh
21  Decl. II") ¶¶ 3-7, but the Court did not consider this
    information. Despite the general admissibility of these exhibits,
22  there are individual exhibits that are insufficiently
    authenticated, see, e.g., Zadeh Decl, Ex. 17, and the Court does
23  not rely on them in its findings of fact. Because of the sheer
    volume of evidentiary objections, the Court's discussion must be
24  held at a certain level of generality. Where either party's
    arguments on admissibility are persuasive, the Court simply
25  disregards the problematic piece of evidence. The findings of
    fact that follow rest on evidence the Court finds admissible or
26  proper for consideration in the context of this motion.
27

28                                    6

1  parties on hearsay grounds. <u>See</u> Evid. Obj. at 3. The Court treats

2  the communications attributable to Cybernet employees as party

3  admissions and will accept the third party communications only

4  insofar as they indicate notice of infringing or potentially

5  infringing activity.[3] <u>See</u> Fed. R. Evid. 801.

6      **C.    PRINTOUTS FROM THE THIRD-PARTY WEBSITES**

7      Cybernet objects to the printouts from third-party websites

8  as a violation of the rule against hearsay. <u>See</u> Fed. R. Evid.

9  801. To the extent these images and text are being introduced to

10 show the images and text found on the websites, they are not

11 statements at all - and thus fall outside the ambit of the

12 hearsay rule.[4] To the extent that Perfect 10 relies on

13 directories and the like as assertions that the links provided

14 actually connect to the subject matter claimed in the link, the

15 Court finds the hearsay issue to be a closer question. The Court

16 will deal with this issue, should it arise, on a case-by-case

17 basis. As for any asserted connection between those sites and

18 Adult Check (Cybernet), the Court finds the evidence of

19 Cybernet's business structure and the workings of Adult Check's

20 age verification program combined with statements identifying the

21

22

23 [3]There are several exhibits attributable to employees other
   than Brad Estes. These are authenticated through the discovery
   process, but the Court also finds that they should be
24 appropriately considered because there is no indication that any
   of these employees have been deposed as of yet.
25

26 [4]When used for this purpose, the Court assumes they are
   subject to the best evidence rule, Fed. R. Evid. 1001. The Court
27 finds that these printouts meet the Rule, for present purposes.

28                                  7

1 | individual websites as Adult Check sites are enough to establish

2 | the sites' membership in the Adult Check program. This takes the

3 | various printouts outside the definition of hearsay, for this

4 | purpose. See Fed. R. Evid. 801(d)(2)(D).

5 | **D.    OBJECTION TO CHART**

6 | Perfect 10 has prepared a chart ("Chart 1") outlining

7 | examples of infringing conduct it claims has been or can be found

8 | on websites affiliated with "Adult Check." Zadeh Decl., Chart 1.

9 | Cybernet argues that the Zadeh declaration has failed to

10 | adequately establish how the chart was compiled, fails to lay an

11 | adequate foundation and that its descriptions of exhibits are

12 | confusing or inaccurate. Evid. Obj. at 5. The Court finds these

13 | objections, as a general matter, to be without merit.

14 | The chart simply reiterates information found elsewhere,

15 | including the website where the information was found, the date

16 | of download, Perfect 10's claimed infringement, a brief

17 | description, which copyright registration covers the claimed

18 | Perfect 10 images, and an assertion concerning rights of

19 | publicity. To the extent this information is found on the face of

20 | each exhibit it is unobjectionable. Further, any errors in

21 | describing the contents are easily confirmed by visual inspection

22 | of the exhibits. Finally, Perfect 10 has provided information

23 | supporting its claimed copyrights and rights of publicity. The

24 | Court finds no reason to exclude Chart 1 and has found it a

25 | helpful reference in its review of the voluminous documents

26 | provided.

27 |

28 |                              8

### E.   REPLY EVIDENCE

Perfect 10 has supplied the Court with a significant volume of reply evidence. Perfect 10 claims most of this evidence is directed at arguments made by Cybernet that this motion should be barred by laches or the doctrine of "unclean hands," challenges to Perfect 10's claims of copyright ownership, and Cybernet's claims to be effectively policing the websites making use of the "Adult Check" brand. Cybernet moved *ex parte* for an order striking all this evidence, which the Court denied in a previous minute order. Nevertheless, for reasons that will become clear the Court has felt no need to consider any of this proposed rebuttal evidence, although isolated exceptions to this general rule will be noted as they appear.

### F.   OBJECTIONS TO CYBERNET'S DECLARATIONS

The Court sustains Cybernet's objections to the Lane Declaration's ¶¶ 70, 71, and 81, except to the extent they may be used as party admissions.

## III. FINDINGS OF FACT

Pursuant to Fed. Rule of Procedure 52(a), the Court makes the followings findings of fact:

**Perfect 10**


1.   Plaintiff Perfect 10, Inc. ("Perfect 10") was formed in 1996 by Norman Zadeh, who has occupied the post of Chief Executive Officer ("CEO") since Perfect 10's formation. Zadeh Decl., ¶ 2.

2.  Mr. Zadeh received his Ph.D. in Operations Research in
    1972, spent some time working in IBM's computer
    research department, and has taught applied mathematics
    as a visiting professor at Stanford, UCLA, U.C. Irvine,
    and Columbia Universities. Id., ¶¶ 3,4.

3.  Armed with a single idea - that there was a market for
    "classy" pictures of nude women without breast
    implants, cosmetic surgery, or the like - Perfect 10
    was formed. Jenal Decl., Ex. L at 94.

4.  Although Mr. Zadeh did not prepare a formal business
    plan before launching Perfect 10, he had some idea
    of the costs involved and an idea of how the magazine
    would develop. Id. at 93; Request for Judicial Notice,
    Ex. 1 ("Bacon's article") at 4.[5]

5.  Since Perfect 10's formation, it has built its
    circulation up to approximately 90,000 issues.[6] Zadeh
    Decl., ¶ 9.

---

[5]Perfect 10 has not objected to Cybernet's request for
judicial notice of this newspaper article.

[6]For purposes of this motion, the Court finds that Zadeh's
role as CEO and familiarity with all aspects of Perfect 10's
business lays an adequate foundation for information related to
Perfect 10's market position, particularly as the Court finds the
majority of Zadeh's testimony and declaration credible.

6.  Perfect 10 created a website, Perfect10.com, in 1996.
    Id.

7.  Perfect10.com receives about 100,000 visitors each
    month. Id. There is no indication how many paid
    subscribers Perfect10.com has attracted.

8.  Perfect 10's first magazine was published in 1997.
    Jenal Decl., Ex. L at 97.

9.  Since Perfect 10's inception it has created
    approximately 3,000 photographic images. Zadeh Decl.,
    ¶ 12.

10. Perfect 10 sells memberships allowing access to
    Perfect10.com at a rate of $25.50 per month to persons
    18 years and older. Id., ¶ 13.

11. Despite Perfect 10's costs per individual picture
    rising into the thousands of dollars, Perfect 10 has
    not been profitable. See Jenal Decl., Ex. L at 97-101.
    The company is now losing approximately $4 to $5
    million per year. Id. at 101.

12. Some of this loss was anticipated by the CEO, Mr.
    Zadeh, although in retrospect those estimates were low.

11

1    _Id._ at 95; _Bacon's_ Article at 4-5. In an August 1997

2    interview, Mr. Zadeh, said that he planned to publish

3    the magazine six times a year at $6.95 per issue.

4    _Bacon's_ Article at 5. For the interview, he stated

5    that he'd be happy losing $500,000 a year, but that he

6    felt he could expect to break even with a few issues.

7    _Id._ At the time, he felt that the magazine would begin

8    attracting advertisers when circulation reached 150,000

9    to 200,000 copies. _Id._

10

11   13.  Perfect 10 lost an estimated $700,000 per issue for

12        the two issues it published in 1997. Jenal Decl., Ex. L

13        at 99. In 1998, Perfect 10 published four issues and

14        estimates losses around $500,000 per issue. _Id._ at 100.

15

16

17   14.  In addition to its website and magazine, Perfect 10

18        has also produced calendars and model of the year

19        videotapes. _Id._ at 101.

20

21   **Age Verification Services**

22

23   15.  The online-pornographic industry faces the constant

24        threat of litigation and regulation stemming from

25        a variety of fears, including access by under-age

26        users and violations of obscenity laws, including those

27

28                          12

1         against child pornography, bestiality and other such

2         subjects that the government identifies and chooses

3         to regulate. See, e.g., Lane Decl. ¶¶ 25, 44.

4

5   16.  Age verification services ("AVS") are meant to

6         provide some level of reassurance to all involved.

7

8   17.  An AVS places a computer script on individual webpages

9         or websites. Farmer Decl., ¶ 15. When a visitor hits

10        a page containing the script, it provides a prompt

11        before allowing the visitor to view the page or other

12        pages on the site. Id. AVS services sell passwords to

13        consumers so they can gain access to materials on

14        participating websites. Lane Decl., ¶ 47; Farmer Decl.,

15        ¶ 13.

16

17   18.  Although not a perfect screen, the credit card is

18        a relatively strong proxy for identifying those who

19        are 18 or older. Lane Decl., ¶ 46.

20

21 **AVS and Credit Card Billing**

22

23   19.  The growth of the online-pornographic business has

24        been a boon to credit card companies. Lane Decl. ¶ 32.

25        At the same time, credit card companies have had

26        problems with a phenomenon called chargebacks as they

27

28                         13

1       relate to online adult businesses. Id. ¶¶ 51, 52.

2

3    20.   Chargebacks are requests for reversals of credit card

4        charges and are often tied to customer complaints. Id.

5        ¶ 51. Mastercard and Visa have established strict

6        limits on the percentages of chargebacks they will

7        tolerate from any one account. Id. ¶ 52. Merchants

8        exceeding those limits are heavily fined and may

9        lose their merchant processing accounts. Id.

10

11 **Cybernet Ventures, Inc.**

12

13    21.   Cybernet Ventures, Inc. ("Cybernet") runs an

14        AVS called "Adult Check." Lane Decl., ¶ 46. Cybernet,

15        through its Adult Check brand, bills itself as the

16        leading AVS on the Internet. Id. ¶ 48. Adult Check

17        claims to have approximately 300,000 "regular" sites

18        and 14,000 "Gold" sites using its service. Umbreit

19        Decl., ¶ 24.

20

21    22.   Based on Adult Check's image requirements, it estimates

22        that there are over 20 million images available on

23        participating web sites. Id. On an average day,

24        Cybernet authenticates an average of 1.9 million Adult

25        Check IDs. Id. ¶ 12.

26

27

28                           14

**Adult Check's Internal Organization**

23. Individual "webmasters" run the websites that make up the Adult Check "network."[7] See, e.g., Lane Decl., ¶ 58. These webmasters are not charged to use the Adult Check service. Umbreit Decl., ¶ 7.

24. Each webmaster is responsible for running the website, including creating the site's content, finding a server to host the site and other technical details, as well as promoting the site. Lane Decl., ¶¶ 34-36.

25. When a new user visits one of these sites, they are directed to Cybernet's site on adultcheck.com to register with Adult Check. Farmer Decl., ¶14; Umbreit Decl. ¶¶ 9, 10.

26. Cybernet has two tiers of membership available, a "regular" membership and an "Adult Check Gold" membership. See, e.g., Umbreit ¶ 24. For $19.95 every three months, a regular member receives access to all sites using the AVS, except for the Gold sites. Zadeh Decl., Ex. 1 at 2. The Gold sites contain more images, more diversity, and generally meet more criteria

---

[7]"Webmasters" are the operators of the individual websites that can be accessed using an Adult Check ID.

1  aimed at ensuring these sites are higher-quality than

2  those available to "regular" members. <u>See, e.g.</u>, Zadeh

3  Decl., Ex. 1 at 19-20 (contrasting requirements);

4  Umbreit Decl., ¶ 22. The Gold memberships are more

5  expensive and provide access to all the websites

6  classified as Adult Check Gold (approximately 14,000

7  sites) for a price of $19.95 per month. Zadeh Decl.,

8  Ex. 4.

9

10  27.  All fees paid by these members go directly to Cybernet.

11  On a semi-monthly basis Cybernet then pays each

12  individual webmaster a commission attributed to the

13  site where the member originally signed up for his or

14  her Adult Check membership. Umbreit Decl., ¶ 13; Zadeh

15  Decl., Ex. 1 at 8-10.

16

17  28.  There are two main factors driving an AVS service's

18  success, the quantity of images available on the

19  participating websites and their quality. See Lane

20  Decl., ¶ 54; Umbreit Decl. ¶ 22. There is also a

21  need to prevent a redundancy of similar sites because

22  this dilutes the experience of viewers, increasing

23  dissatisfaction with a service and increasing the

24  likelihood of users leaving the service or requesting

25  chargebacks. Lane Decl., ¶ 57; Zadeh Decl., Ex. 1 at

26  21.

27

28                          16

29.    Adult Check has a financial incentive to insure
       that the participating websites are numerous, somewhat
       distinctive and contain images that attract users. As
       a result Adult Check has adopted a variety of
       guidelines concerning the content provided by the
       websites using its name and services. Zadeh Decl, Ex.
       1 at 15-24.


30.    Adult Check has divided up its websites into six tiers.
       They are as follows:


Tier 1.    Adult Check exclusive sites with only Adult Check
           ads or no ads at all;
Tier 2.    Adult Check exclusive sites with both Adult Check
           ads and non-Adult Check ads;
Tier 3.    Adult Check Exclusive sites with non-Adult Check
           ads.
Tier 4.    Non-exclusive sites with only Adult Check ads
           or no adds ad all;
Tier 5.    Non-exclusive sites with both Adult Check ads
           and non-Adult Check ads;
Tier 6.    Non-exclusive sites with non-Adult Check ads.


       Each tier involves greater value for users along a
       spectrum defined by greater commitment to the Adult
       Check brand.

17

See Zadeh Decl., Ex. 1 at 16.

31.    Cybernet views sites and assigns keywords to further
       efficiency of an internal search engine that it
       provides as a service to consumers. Zadeh Decl., Ex. 12
       at 63.

32.    Part of Cybernet's Adult Check service is a linking
       service found on adultcheck.com. Cybernet provides
       links to various webpages organized by category,
       including categories devoted to celebrity sites.
       See, e.g., Zadeh Decl., Exs. 72 & 81.

33.    Adult Check also provides a search function that
       searches for content within the Adult Check affiliated
       websites and webpages. Umbreit Decl., ¶ 17.

**Adult Check Policies**

34.    Adult Check has also endorsed a number of "General
       Policies," including:

1)     Any unlawful activities or activities that, within
       the sole and absolute discretion of Adult Check may be

1    or are harmful to its reputation, image, goodwill

2    (including but not limited to inappropriate Usenet

3    postings or spamming) will result in immediate

4    termination;

5

6    2)    Illegal content is strictly prohibited. Illegal content

7    includes, but is not limited to: minors, rape and

8    bestiality;

9

10    3)    Fraud, illegal activities, unfair or deceptive trade

11    practices or violation of the Adult Check Policies will

12    result in immediate termination of your account; and

13

14    4)    Violation of the Adult Check limited use license of

15    trademarks and copyrighted materials is prohibited.

16

17    Zadeh Decl., Ex. 1 at 13.

18

19    35.    Adult Check also has a policy related to its Links

20    Page, which leads Adult Check users to various sites

21    and webpages by providing a directory organized by

22    category. In order to be listed on the Links Pages:

23

24    1) A site may not display, publish, link to or provide

25    access to any images, pictures, stories, video clips

26    or any other media portraying any content that is deemed

27

28                                    19

illegal in the United States. Any site containing content
deemed illegal in the United States will be removed from
the Links Page and the account will be deactivated;

2) Each Adult Check Site must contain unique, quality and
adequate content. The quality, uniqueness and adequacy of
the content is solely within the discretion of AC, but
generally means at least 30 pictures of sufficient
quality to provide value to the Adult Check customer.
These guidelines are loose and subjective to insure that
there is a definite benefit for the Adult Check customers
without requiring them to pay extra fees;

3) A participating site must be placed in the appropriate
category of the Links Pages and the description of the
site must be accurate. Any deceptive information is
grounds for removing the site from the Links Page.

4) Site names and site descriptions must not be false,
misleading or deceptive.

5) Multiple sites owned by the same person or entity must
be designed as individual sites and may not be listed
more than once.

6) Feeder sites, must also comply with the minimal

20

1    standards.

2

3    7) Membership sites, requiring further membership fees

4    must provide content before an Adult Check customer

5    is required to pay any fees.

6

7    8) The webmaster is responsible for providing all content.

8    Cybernet disclaims any responsibility for content.

9

10    9) All sites are reviewed and monitored for continued

11    compliance.

12

13    10) Each site submitted must be unique. Templated sites will

14    not be accepted for placement on the links page.

15    Templated sites are defined as two or more sites that

16    are created or appear to the viewer as substantially

17    identical, despite minor variations such as site title.

18

19    11) The use of any registered trademark, trade name,

20    copyright or exclusive publicity right without proper

21    authority or written consent of the owner, will not be

22    permitted on any Adult Check site. violation of this

23    policy will, among other things, result in the removal

24    of the violating site from the Links pages and the

25    termination of the website's affiliation with Adult

26    Check.

27

28    21

1    Zadeh Decl., Ex. 1 at 15, 16.

2

3    36.   Adult Check also has a Child Pornography policy. Adult

4          Check classifies its Child Pornography policy as "zero

5          tolerance." This policy is enforced anywhere images,

6          words or inferences relating to child pornography are

7          used in conjunction with the Adult Check system. Adult

8          Check explicitly states: "This is **not** limited to sites

9          linked to from our links pages," thus implying it

10         applies to all content accessed through the use of

11         Adult Check passwords. When this policy is violated,

12         the site will be closed, removed from the Adult Check

13         system without warning, the limited use license for the

14         Adult Check script will be revoked and the offender

15         must remove all links and references to Adult Check

16         from the offender's sites, presumably going beyond the

17         single webpage or site where the offending material

18         appears. Zadeh Decl., Ex. 1 at 14, 15 (emphasis added

19         to quote).

20

21   37.   Prior to August 8, 2001, Cybernet's policy on

22         copyright and trademark violations was self-

23         characterized as "neutral." In an email, one

24         employee put it this way:

25

26         If Webmaster A contacts us and says that Webmaster B is

27

28                                22

1    violating his or her copyrights or trademarks we will

2    do one thing and one thing only. Adult Check will

3    forward an email from Webmaster A to Webmaster B. It is

4    then Webmaster B's responsibility to reply to Webmaster

5    A and solve the matter.

6

7    It would never be a good idea for Adult Check to take

8    any other stance in these matters. Doing so would open

9    a huge amount of legal liability due to the possibility

10   of error. Webmaster A could be lying and Webmaster B

11   could have designed the site first and it could have

12   actually been Webmaster A who copied it! This is why we

13   stay neutral.

14

15

16   Zadeh Decl., Ex. 20 at 240; see also Mausner Decl., Ex. C at

17   97.

18

19   38.  Since August 8, 2001, Cybernet has promulgated a

20   copyright policy labeled "Digital Millennium Copyright

21   Act ("DMCA") policy". Under this policy, a notice of

22   infringement sent to Cybernet must include:

23

24   1)   A physical or electronic signature of the owner or a

25   person authorized to act on behalf of the owner;

26

27

28                                  23

2)   An identification of the copyrighted work and if it
     is located on a web page, the specific address of the
     web page should be provided;

3)   ID of the material that is claimed to be infringing
     or the subject of infringing activity;

4)   statement of good faith belief that use of the material
     is not authorized by the copyright owner, its agent or
     the law;

According to Cybernet's "DMCA Policy", upon receipt of a
written notification meeting all of its criteria, Cybernet
will:

1)   Act expeditiously to remove links or disable access to
     the allegedly infringing material;

2)   Take reasonable steps to promptly notify the accused
     subscriber; and

3)   forward a copy of the written notification to the
     accused subscriber.

This policy then provides for a counter notification
procedure to be used by webmasters accused of infringement.

24

1    Finally, "in appropriate circumstances where [Cybernet]

2    receives multiple notices, subscribers to [its] age

3    verification services will be terminated."

4

5    Zadeh Decl., Ex. 1 at 21-24.

6

7    39.    There is no credible evidence that Cybernet actively

8           enforces its "DMCA policy." Rather there is evidence

9           that four months after the policy became effective and

10          well after this action had begun, clearly infringing

11          pictures were on websites identified by Perfect 10

12          in its Second Amended Complaint, <u>see</u> Zadeh Decl., Ex.

13          76, as well as blatantly infringing pictures on sites

14          listed in the Third Amended Complaint, see Zadeh

15          Decl., Ex. 31.

16

17   **Conduct by Adult Check Affiliated Websites**

18

19   40.    Sites affiliated with Adult Check have engaged in

20          a range of conduct, of which a representative sample

21          includes:

22

23   41.    On August 6, 2001, a website affiliated with

24          Adult Check, named FemCelebs and located at

25          animald.com, contained identical copies of at

26          least three Perfect 10 magazine covers. Zadeh Decl.,

27

28                                25

1        Ex. 8. Perfect 10 was assigned rights of publicity by

2        the pictured models. Zadeh Decl., Ex. 117

3

4   42.  On December 19, 2001, another Adult Check

5        affiliated website, Celebrities Online, located at

6        www.celebs-online.com, displayed identical copies

7        of several photographs containing pictures derived

8        from the Perfect 10 magazine and Perfect 10's website.

9        The pictured model had assigned her rights of

10       publicity to Perfect 10. Several of the pictures

11       contained the words Perfect 10 as well as a Perfect

12       10 copyright notice. Zadeh Decl., Ex. 31.

13

14  43.  On December 20, 2001, another site affiliated

15       with Adult Check, Before & After, located at

16       joebosco.com, displayed identical pictures

17       derived from Perfect 10's magazine and containing

18       models who had assigned their rights of publicity to

19       Perfect 10. Zadeh Decl., Ex. 38.

20

21  44.  On December 22, 2001, fredd38.com, part of the

22       websites owned by defendants FTV, ftv.net, Vic Toria,

23       and AEI Productions (collectively, "the FTV

24       defendants"), and affiliated with Adult Check,

25       displayed a picture purporting to be Christina Aguilera

26       posing topless, but actually contained a photograph of

27

28                              26

1    a Perfect 10 model found on its website, altered by

2    adding Ms. Aguilera's head. Zadeh Decl., Ex. 46. This

3    model had assigned her rights of publicity to Perfect

4    10.

5

6    45.    On December 11, 2001, the website located at

7    celeblust.com, also owned by the FTV defendants

8    displayed a picture purporting to be a topless Faith

9    Hill, but actually contained a digitally altered

10    image of a Perfect 10 model. Zadeh Decl., Ex. 57

11

12    46.    These examples are not isolated and Perfect 10 has

13    found more than 10,000 copies of Perfect 10 images

14    on approximately 900 websites affiliated with Adult

15    Check.[8] Zadeh Decl., ¶ 46.

16

17    **Defaults Entered**

18

19    47.    Sean Devine has had a default entered against

20    him based on Perfect 10 images and models displayed

21    on the website BabesofBablyon.com. See Zadeh Decl., Ex.

22    115.

23

24    48.    Default has been entered against defendants Funet, Inc.

25    _____

26    [8]The Court finds Mr. Zadeh's testimony on this count to be

27    credible and Cybernet has advanced no information to dispute it.

28                                27

1      and AEI Productions, Inc., supported by Zadeh Decl.,

2      Ex. 116 & Ex. 114.

3

4  **Extent of Problematic Images and Sites**

5

6      49.   A significant number of the images found on websites

7            affiliated with Adult Check consist of images:

8

9            1)   containing celebrities who have not consented to

10                the use of such images;

11           2)   contain the heads of celebrities superimposed on

12                other models, including Perfect 10 models;

13           3)   identical to those protected by Perfect 10's

14                copyrights;

15           4)   displaying Perfect 10's trademarks;

16           5)   displaying copies of Perfect 10's images with

17                another identifying mark placed on the image; and

18           6)   containing images of models who have assigned

19                their rights of publicity to Perfect 10.

20

21     50.   Celebrity websites make up approximately 4,000 of the

22           314,000 websites affiliated with Adult Check. They may

23           make up as many as 2,000,000 of the images found on

24           the Adult Check affiliated sites. Umbreit Decl. ¶ 19.

25

26     51.   Some of these websites identify themselves as "fake."

27

28                                 28

1      Zadeh Decl., Ex. 107.

2

3    52.   Some of these websites portray graphic scenes

4          and create the impression that the celebrities

5          mentioned are affiliated with the action presented.

6

7    53.   Cybernet chooses which websites are placed in the

8          celebrity category.

9

10  **Notice to Cybernet of Problems on Affiliated Sites**

11

12   54.   Cybernet was provided with notice of 18 celebrities

13         that objected to usage of their identities and/or

14         images on Adult Check affiliated sites back in November

15         27, 2000. Zadeh Reply Decl. ("Zadeh Decl. II"), Ex. 19

16         at 267.[9]

17

18   55.   On January 7, 2002, Perfect 10 provided a number of

19         declarations to the Court from celebrities, generally

20         providing:

21

22         I have not licensed any pornographic website or any

23         _____

24         [9]The Court utilizes this evidence because it is consistent
    with a declaration submitted by Lin Milano to the Court in August
25   22, 2001. That declaration provides evidence of notice and the e-
    mail meets Cybernet's previous objection that Ms. Milano's
26   declaration does not meet the best evidence rule. See Evid. Obj.
27   to Decl. of Lin Milano, filed Aug. 23, 2001.

28                                    29

1     affiliate of such website to sue or exploit my name,
2     likeness or identity. In general, I do not want any
3     entity to use or exploit my name, likeness or
4     identity, without my express written permission, or
5     the permission of my manager or someone with the
6     authority to act on my behalf.
7
8     Aguilera Decl.
9
10    56.  In order for a site to be accepted into the Adult
11         Check system, Cybernet reviews the site. Zadeh Decl.,
12         Ex. 30 at 287a.
13
14    57.  Among the considerations in reviewing these sites,
15         Cybernet looks for potentially underage images and
16         overuse of celebrity images. Id. at 287b
17
18    58.  On February 27, 2001, three months after a group of
19         celebrities provided Adult Check with direct notice
20         that use of their images was not allowed, an Adult
21         Check employee refused to accept a site because, among
22         other reasons:
23
24         Please make sure that your site does not have any
25         of the following models in its principal content [incl.
26         models listed in request]. . . . This content cannot
27
28                              30

1        be allowed since *it would continue to oversaturate our*

2        *links page.*

3

4        Zadeh Decl., Ex. 30 at 287b.

5

6    59.   Generally, Cybernet considers an image to be

7        oversaturated if it appears 7 to 10 times. Id., Ex. 1

8        at 21; Ex. 30 at 287b.

9

10   60.   Cybernet has a staff of twelve that reviews sites

11       when they initially join Adult Check, with a goal

12       of doing monthly reviews, and the staff also does

13       spot checking. Mausner Decl., Ex. C at 102, 114.

14

15   61.   Cybernet actively reviews and directs affiliated

16       webmasters on the appearance and content of their

17       sites. Zadeh Decl., Ex. 30.

18

19   62.   Cybernet provides Adult Check webmasters with a variety

20       of tools to help them develop their websites. See,

21       e.g., Zadeh Decl., Exs. 1, 18.

22

23   63.   Adult Check's Knowledge Base does not discuss

24       protection of copyrights, trademarks or publicity

25       rights. See Zadeh Decl., Ex. 18.

26

27

28                       31

IV.  **CONCLUSIONS OF LAW**

1. There is not a serious question on the merits concerning Cybernet's liability for direct copyright infringement of Perfect 10's copyrights.

2. There is a strong likelihood of success for Perfect 10's contributory copyright infringement claims against Cybernet.

3. There is a strong likelihood of success for Perfect 10's vicarious copyright infringement claims against Cybernet.

4. There is a substantial question whether or not Cybernet is a provider of online services under the Digital Millennium Copyright Act ("DMCA").

5. If Cybernet qualifies as an online service provider under the DMCA there is little likelihood that any DMCA "safe harbor" will apply.

6. There is not a strong likelihood of success on Perfect 10's direct liability claims against Cybernet for violating the models' publicity rights assigned to Perfect 10.

7. There is a strong likelihood of success on Perfect 10's claims of aiding and abetting liability for Cybernet's role in the violations of the publicity rights assigned to Perfect 10.

8. Perfect 10 has standing to assert as an unfair business practice the abuse of publicity rights for those persons who have provided Cybernet with actual notice that use of their images is not authorized.

9. There is a strong likelihood of success on Perfect 10's claim that Cybernet has violated California's unfair business practices act by violating the rights of publicity for those persons who have provided Cybernet with actual notice that use of their images is not authorized.

10. There is not a strong likelihood of success on Perfect 10's claims that Cybernet is liable for contributory trademark infringement of Perfect 10's trademark rights.

11. Cybernet has not made a good faith effort to root out illegal conduct among its webmasters and gains direct financial gains as a result.

11.  Cybernet is a competitor of Perfect 10's.

12.  There is a strong likelihood that Perfect 10 will prevail on its claim that Cybernet's practices are "unfair" under the unfair business practices act.

13.  The unclean hands and laches doctrines are not applicable to this motion.

14.  Harm is presumed for unfair competition, violations of copyright, and for trademark infringement.

15.  Perfect 10 has shown a strong likelihood that it will suffer irreparable harm if the unfair business practices, copyright violations, and trademark violations are not enjoined.

16.  Enjoining these practices is consistent with the public interest.

17.  Enjoining these practices will not result in an inequitable burden on Cybernet.

18.  The balance of hardships tips in favor of Perfect 10.

V.   PRELIMINARY INJUNCTION STANDARDS

1      In the Ninth Circuit, two interrelated tests exist for
2  determining the propriety of the issuance of a preliminary
3  injunction.  Under the first test, the Court may not issue a
4  preliminary injunction unless:  (1) the moving party has
5  established a strong likelihood of success on the merits; (2) the
6  moving party will suffer irreparable injury and has no adequate
7  remedy at law if injunctive relief is not granted; (3) the
8  balance of hardships tips in favor of the movant; and (4)
9  granting the injunction is in the public interest.  See Martin
10  Int'l Olympic Comm., 740 F.2d 670, 674-75 (1984); Greene v.
11  Bowen, 639 F. Supp. 554, 558 (E.D. Cal. 1986).  Under the
12  alternative test, a plaintiff must show either (1) a combination
13  of probable success on the merits and the possibility of
14  irreparable injury; or (2) that a serious question exists going
15  to the merits and that the balance of hardships tip sharply in
16  the plaintiff's favor.  See First Brands Corp. v. Fred Meyer,
17  Inc., 809 F.2d 1378, 1381 (9th Cir. 1987).

18     The two tests represent "a continuum of equitable discretion
19  whereby the greater the relative hardship to the moving party,
20  the less probability of success must be shown." Regents of Univ.
21  of Calif. v. ABC, Inc., 747 F.2d 511, 515 (9th Cir. 1984). See
22  also Benda v. Grand Lodge of Int'l Ass'n of Machinists, 584 F.2d
23  308, 315 (9th Cir. 1978).

24  **VI.   LIKELIHOOD OF SUCCESS**

25     **A.   COPYRIGHT INFRINGEMENT**

26        **1.   Direct Infringement**

27

28                       35

1    To prove copyright infringement, a plaintiff must prove two

2   elements: (1) ownership of a valid copyright, and (2) copying of

3   protectable expression by the defendant. Baxter v. MCA, Inc., 812

4   F.2d 421, 423 (9th Cir. 1987). Infringement occurs when a

5   defendant violates one of the exclusive rights of the copyright

6   holder. 17 U.S.C. § 501(a). Direct infringement does not require

7   intent or any particular state of mind, although willfulness is

8   relevant to the award of statutory damages. 17 U.S.C. § 504(c).

9         **a.   Does Perfect 10's Registered Copyright**

10             **In Its Magazines Cover The Individual Pictures**

11             **Involved Here?**

12    Cybernet's first line of defense is to challenge the

13   adequacy of Perfect 10's showing of copyright protection for its

14   claimed images. Opp'n at 18. Cybernet contends that the copyright

15   registrations produced in this motion involve collective works,

16   the Perfect 10 magazines and the Internet site, but the

17   registrations do not establish copyrights in the individual

18   pictures. Opp'n at 18. Cybernet's only authority is a quote to 15

19   U.S.C. § 103(b) which provides:

20

21         The copyright in a compilations or derivative work

22         extends only to the material contributed by the author

23         of such work and distinguished from the preexisting

24         material employed in the work and does not imply an

25         exclusive right in the preexisting material. The

26         copyright in such work is independent of, and does not

27

28                           36

1        alter or enlarge the scope, duration, ownership, or

2        subsistence of, any copyright protection in the

3        preexisting material.

4

5    15 U.S.C. § 103(b).

6        It is unclear exactly what Cybernet is challenging - Perfect

7    10's ability to bring suit under the Copyright Act, the scope of

8    the registrations, the entitlement to the presumption of *prima*

9    *facie* validity as to the copyright registration, or directly

10   challenging Perfect 10's claimed copyright in these images.

11       As an initial matter, where the owner of a copyright for a

12   collective work also owns the copyright for a constituent part of

13   that work, registration of the collective work is sufficient to

14   permit an infringement action under 15 U.S.C. § 411(a).[10]

15   Moreover, the Court finds that Perfect 10 is entitled to treat

16   the copyright registrations as *prima facie* evidence that the

17   individual pictures are copyrighted. See <u>Autoskill, Inc. v.</u>

18   <u>National Educ. Support Sys., Inc.</u>, 994 F.2d 1476, 1487-88 (10th

19   Cir. 1993), <u>disagreed with on other grounds</u>, <u>Parker v. Bain</u>, 68

20   F.3d 1131, 1136 n.8 (9th Cir. 1995); <u>cf.</u> 17 U.S.C. § 404 (similar

21   principle with regard to reach of copyright notice in collective

22

23   _____

24       [10]<u>Morris v. Business Concepts, Inc.</u>, 259 F.3d 65, 68 (2d
     Cir. 2001); <u>see also</u> 37 C.F.R. 202.3(b)(3)(2001)("the following
25   shall be considered a single work: . . . all copyrightable
     elements that are otherwise recognizable as self-contained works,
26   that are included in a single unit of publication and in which
     the copyright claimant is the same."); <u>Hilliard v. Mac's Place,</u>
27   <u>Inc.</u>, 1994 WL 323961 *1 (W.D. Wash. 1994).

28                                    37

1   work). Perfect 10's copyright registrations for the magazine

2   issues indicate that they are collective works where

3   contributions to the work were works "made for hire." See, e.g.,

4   Mausner Decl., Ex. A at 9. The website registration recognizes

5   that the two-dimensional text and photographs on the site include

6   contributions made for hire and incorporate photographs published

7   in the Perfect 10 magazine. Id. at 7-8. The Court concludes this

8   is sufficient to raise the presumption of validity, particularly

9   where Cybernet has made no sustained argument to the contrary.[11]

10   Perfect 10 has shown a strong likelihood that it owns a valid

11   copyright in the asserted images.

12        **b.**   **Has Cybernet Violated Any of Perfect 10's Rights**

13             **Under the Copyright Act?**

14      Cybernet's other argument fares better. Cybernet contends

15

16      [11]The Court finds the case of Cooling Systems & Flexibles,
Inc. v. Stuart Radiator, Inc., 777 F.2d 485, 490 (9th Cir. 1985)
17   *abrogated on other grounds by* Fogerty v. Fantasy, Inc., 510 U.S.
18   517 (1994), distinguishable. There the Ninth Circuit refused to
allow the plaintiff to use the presumption of validity to defeat
19   the district court's finding that preexisting works did not bear
a copyright notice. Id. This result was consistent with the
20   discretion afforded a district court in considering the
evidentiary weight to be accorded a certificate of registration,
21   see 17 U.S.C. § 410(c). Additionally, evidence was brought in
22   contradicting the presumption of validity and it was conceded the
copyright covered a derivative work. 777 F.2d at 489-90. Cybernet
23   has not made an argument to establish similar points, nor
addressed the Court's discretion under § 410(c). In this case,
24   the Court will therefore favor the presumption of validity over
Cybernet's attempt to reverse this presumption for collective
25   works by assuming that they are merely derivative works. Although
26   Perfect 10 refers to the registered works as a "compilation" in
its Reply, see Reply at 15, the Court notes that the certificates
27   claim to cover "collective works."

28                   38

1 | that it cannot be held directly liable for any copyright

2 | infringement carried out by its affiliated websites because "no

3 | infringing files exist on any computer equipment owned by

4 | Cybernet." Opp'n at 19. Perfect 10 does not address this argument

5 | in its reply papers and the Court finds that there is little

6 | likelihood of success on this claim. Assuming that websites on

7 | the Adult Check system infringe Perfect 10's copyrights, there is

8 | no evidence that Cybernet owns any of these websites or otherwise

9 | engages in directly infringing activity in the classic sense.

10 | There might exist another route to direct liability,

11 | however. Computer technology, and in particular the Internet, has

12 | created a challenge to copyright's strict liability scheme.

13 | Because of the architecture of the web and the workings of

14 | computer technology, almost any business that utilizes computer

15 | hardware to create access to the Internet or to store content may

16 | find its hardware creating or displaying infringing material as a

17 | result of decisions by third-parties (the system's users) without

18 | the business doing any truly volitional actions.

19 | Religious Technology Center v. Netcom On-line Comm. Servs.,

20 | Inc., 907 F. Supp. 1361 (N.D. Cal. 1995), illustrates this point

21 | vividly. In Religious Technology, a disgruntled former Church of

22 | Scientology member was accused of posting copyrighted works on

23 | the Internet. Id. at 1365-66. This member used a bulletin board

24 | service (BBS) to gain access to the Internet, and the BBS in turn

25 | used the facilities of Netcom to provide this access. Id. at

26 | 1366. When the initial defendant sent his postings to the

27 |

28 | 39

1  Internet, the information was automatically stored briefly on the

2  BBS's computer and then automatically copied on Netcom's

3  computer. Id. at 1367. Once on Netcom's computers, the messages

4  were then available to Netcom's users and eventually to all users

5  that participated in a service called Usenet. Id. at 1367-68.

6      The Ninth Circuit in a previous case, MAI Systems Corp. v.

7  Peak Computer, Inc., 991 F.2d 511, 518 (9th Cir. 1993) had upheld

8  a finding of copyright infringement where a repair person who was

9  not authorized to use a computer owner's licensed operating

10  system software had merely turned on the computer.[12] The relevant

11  copying in MAI Systems was the loading of the operating system

12  into the computer's memory long enough to check an "error log."

13  991 F. 2d at 518. Similarly, in Religious Technology, the

14  existence of the messages on the system were "sufficiently

15  'fixed' to constitute recognizable copies under the Copyright

16  Act." 907 F. Supp. at 1368.

17      Nevertheless, the Religious Technology court found Netcom

18  was not liable for direct copyright infringement. Id. at 1372-73.

19  First the court noted that Netcom had not initiated the copying.

20  Id. at 1368. The court then analogized Netcom's creation of a

21  system that automatically and uniformly creates temporary copies

22  of all data through it to a copying machine. Id. at 1369. The

23  court rejected the possibility that such actions could violate

24  the exclusive right to reproduce a work absent some further

25

26      [12]But see 17 U.S.C. § 117 (limiting reach of exclusive

27  rights in precisely this situation).

28                              40

1  element of volition or causation, relying on the unreasonable

2  liability such a regime would create. Id.

3      Similarly, the Netcom court rejected the argument that the

4  storage of the works on Netcom's system for up to eleven days

5  violated the plaintiffs' right to publicly distribute and display

6  their works. Id. at 1371-72. The court found that there was the

7  same causation and volition problems that infected the

8  reproduction claim. Id. at 1372. The actions of the BBS provider

9  were automatic and indiscriminate. Id. Moreover, the court

10  pointed to the fact that Netcom did not maintain an archive of

11  files for its users, thus it could not be said to be supplying a

12  product to users. Id. This contrasted with some of its

13  competitors that created or controlled content available to their

14  subscribers. Id. The failure to establish violation of the

15  plaintiffs' reproduction, distribution or display rights *by*

16  *Netcom* thus defeated plaintiffs' direct infringement theory. See

17  id. at 1370, 1373.

18      Following the Religious Technology decision, another

19  district court found that a BBS operator that knew about

20  copyright infringement on its service and encouraged others to

21  upload infringing products onto his service could not be held

22  liable on a direct infringement theory. See Sega Enterprises,

23  Ltd. v. MAPHIA, 948 F. Supp. 923, 931 (N.D. Cal. 1996). This was

24  so because the activity charged had no bearing on whether the BBS

25  operator "directly caused" the copying to occur. Id.

26      Finally, in Playboy Enterprises, Inc. v. Russ Hardenburgh,

27

28                                   41

1  Inc., 982 F. Supp. 503, 512 (N.D. Ohio 1997), a district court

2  found direct infringement despite its agreement with the

3  rationale of Religious Technology. The Hardenburgh court stressed

4  that a direct infringer must "actually engage" in one of the

5  activities reserved to copyright owners. Id. In Hardenburgh, the

6  court found that the defendant BBS providers engaged in two of

7  the activities exclusively reserved for copyright owners. Id. at

8  513.

9      First, the court found the defendants had distributed and

10 displayed copies of Playboy photographs. Id. This finding hinged

11 on the defendant's policy of encouraging subscribers to upload

12 files onto its system, viewing the files in the upload file, and

13 *then* moving the uploaded files into files generally available to

14 subscribers. Id. This transformed the defendants from passive

15 providers of a space to active participants in the process of

16 copyright infringement. The moving of the files, accomplished by

17 employees constituted the distribution, and the display of those

18 copes after the BBS's employees *placed* the files there violated

19 the right of display. Id.

20     The principle distilled from these cases is a requirement

21 that defendants must actively engage in one of the activities

22 recognized in the Copyright Act.[13] Based on the evidence before

23 the Court it appears that Cybernet does not use its hardware to

24

25     [13]See also Kelly v. Arriba Software Corp., 280 F.3d 934, 946

26 (9th Cir. 2002)(holding company that designed search engine,
   which trolled web, found images and then inline linked and framed

27 those images on its sites, was liable for direct infringement).

28                         42

1   either store the infringing images or move them from one location

2   to another for display. This technical separation between its

3   facilities and those of its webmasters prevents Cybernet from

4   engaging in reproduction or distribution, and makes it doubtful

5   that Cybernet publicly displays the works. Further, there is

6   currently no evidence that Cybernet has prepared works based upon

7   Perfect 10's copyrighted material. The Court therefore concludes

8   that there is little likelihood that Perfect 10 will succeed on

9   its direct infringement theory.

10          2.   Contributory Infringement

11       Liability for contributory copyright infringement attaches

12   when "one who, with knowledge of the infringing activity,

13   induces, causes or materially contributes to the infringing

14   conduct of another." A&M Records, Inc. v. Napster, Inc., 239 F.3d

15   1004, 1019 (9th Cir. 2001)("Napster II"). Put differently,

16   liability exists if the defendant engages in personal conduct

17   that encourages or assists the infringement. Id. The standard for

18   the knowledge requirement is objective, and is satisfied where

19   the defendant knows or has reason to know of the infringing

20   activity. Gershwin Publishing Corp. v. Columbia Artists Mgmt.,

21   Inc., 443 F.2d 1159, 1162 (2d Cir. 1971).

22          a.   Cybernet's Knowledge

23       Cybernet's only argument against Perfect 10's contributory

24   infringement theory is that Cybernet lacks the requisite

25   knowledge to be held liable. Opp'n at 20. Cybernet relies heavily

26   on Perfect 10's failure to contact Cybernet with its claims

27

28                          43

1  before beginning the present litigation. Id. According to

2  Cybernet, although it employs twelve site reviewers, even if they

3  had seen Perfect 10 copyright notices on various sites, they

4  would not necessarily know Perfect 10's copyrights were infringed

5  because they might be licensed. Id. at 20-21.

6       In contrast, there is evidence that Steven Easton of the

7  Association for the Protection of Internet Copyright contacted

8  Cybernet with approximately 2,000 e-mails, beginning in 1996 or

9  1997, notifying Cybernet of alleged copyright infringement on its

10  system.[14] Easton Decl. ¶ 2. Perfect 10 has also brought forward

11  evidence that Cybernet was notified of generic potential

12  copyright infringement by users in 2001. Zadeh Decl., Ex. 102.

13  Additionally, Cybernet's site reviewers review every site before

14  allowing the sites to utilize the Adult Check system, and attempt

15  to review other sites monthly. Mausner Decl., Ex. C at 102, 114;

16  Zadeh Decl., Ex. 30. Although they might not detect every

17

18       ───────────────────

19       [14]This declaration is being used for the limited purpose as
    evidence of notice. The Court finds the declaration credible and
    interprets Mr. Easton's claim that he began notifying Cybernet of

20  "violations of copyright under the DMCA" in 1996 or 1997, to be
    a claim that he began notifying Cybernet of alleged copyright

21  violations at that time. The Court pauses to reflect on
    Cybernet's earlier objection to this declaration because [it] "is

22  simply making prejudicial and defamatory allegations against
    Cybernet, which can no longer be permitted, let alone as evidence

23  for this Court to consider," Evid. Obj. to Portions of Decls.,
    filed December 17, 2001, in light of Cybernet's current evidence

24  that "many of the notices sent by Steven Easton were deficient
    and thus, Cybernet could not act on them." Umbreit Decl. ¶ 26

25  (emphasis added). This is just another instance where Cybernet's
    prior invective undercuts its claims to be honestly working to

26  
27  address potential problems with its affiliated sites.

28                                      44

1  copyright violation, there is evidence that many sites contain

2  disclaimers to the effect, "we do not hold copyrights for these

3  works." Farmer Depo. at 121:19-21. Finally, Perfect 10's Second

4  Amended Complaint, filed on June 15, 2001, contained notice of

5  Perfect 10's allegations concerning potential infringement on 77

6  different websites.

7

8      This evidence of notice compares favorably with the

9  allegations of notice in Fonovisa, Inc. v. Cherry Auction, Inc.,

10 76 F.3d 259 (9th Cir. 1996). In Fonovisa, the Fresno County

11 Sheriff's Department seized 38,000 counterfeit tapes (copyright

12 holders unstated) from a swap meet approximately a year and a

13 half before the plaintiff filed suit. See Fonovisa, Inc. v.

14 Cherry Auction, Inc., 847 F. Supp. 1492, 1494 (E.D. Cal. 1994)

15 rev'd 76 F.3d 259 (9th Cir. 1996)("Fonovisa I"). Additionally,

16 the swap meet had received a letter six months before the suit

17 from a police officer who "observed that several casual vendors

18 of Latin audio music tapes had abandoned their booths upon his

19 arrival." Id. at 1494. Finally, three months before the suit an

20 investigator for the plaintiff witnessed infringing sales of

21 counterfeit goods. Id. After the First Amended Complaint was

22 served, investigators then revisited the swap meet where they

23 found many vendors selling "counterfeits at tellingly low

24 prices." Id. at 1495. On appeal from the district court's

25 dismissal of the claim, the Ninth Circuit stated "There is no

26 question that plaintiff adequately alleged the element of

27

28                               45

1 knowledge in this case." <u>Fonovisa</u>, 76 F.3d at 264.

2    Perfect 10 has raised at least a serious question on the

3 issue of knowledge. The Court finds that there is a strong

4 likelihood of success in proving general knowledge of copyright

5 infringement prior to Perfect 10's filing of the complaint. There

6 are also serious questions as to Cybernet's constructive

7 knowledge of infringement of Perfect 10's copyrights <u>prior</u> to the

8 complaint raised by this general knowledge, Cybernet's review of

9 sites containing Perfect 10 images and the likelihood of those

10 sites containing copyright disclaimers. Further, there appears to

11 be little question that Cybernet has been provided with actual

12 notice of a large number of alleged infringements since June

13 2001.[15] The Court thus finds there is a strong likelihood of

14 success that Perfect 10 will satisfy the knowledge requirement

15 for contributory liability.

16              b.    **Cybernet's Material Contribution to**

17                    **Infringing Activity**

18    The Court also finds that there is a strong likelihood that

19 Perfect 10 will succeed in establishing Cybernet's material

20 contributions to the infringing activity. Cybernet markets the

21 Adult Check brand through advertising, it pays webmasters

22 commissions directly based upon the number of Adult Check users

23

24    [15]Neither party addressed the role of post-filing conduct,
but the Court notes that in <u>Fonovisa I</u>, 847 F. Supp. at 1495, and
25 <u>A&M Records, Inc. v. Napster, Inc.</u>, 114 F. Supp. 2d 896, 918
(N.D. Cal. 2000) aff'd in part, rev'd in part, 239 F.3d 1004 (9th
26 Cir. 2001)("<u>Napster I</u>"), the courts relied to some extent upon
27 allegations in the complaint and post-filing conduct.

28                                   46

1  that register through the site, it provides technical and content

2  advice, it reviews sites, and it attempts to control the quality

3  of the "product" it presents to consumers as a unified brand.

4  Cybernet's entire business model is premised on harnessing the

5  competitive pressures between individual webmasters into a

6  cooperative system that benefits the webmasters by increasing the

7  overall value to consumers. Cybernet's role in this system is

8  crucial, and it profits accordingly, only paying out

9  approximately ½ of each subscriber's payments to the

10  participating websites for each of its users, who access the

11  system close to 2 million times daily.

12      In Fonovisa the Ninth Circuit had "little difficulty" in

13  holding the allegations directed at a swap meet, where the

14  vendors were selling counterfeit goods, sufficient to show

15  material contribution. 76 F.3d at 263. As the court observed, "it

16  would be difficult for the infringing activity to take place in

17  the massive quantities alleged without the support services

18  provided by the swap meet," including the provision of space,

19  utilities, parking, advertising, plumbing and customers. Id.

20  Similarly, Cybernet's hand in Adult Check, and in particular its

21  steady payments to infringing sites along with its advertising,

22  materially contribute to the growth and proliferation of any

23  infringement. This conclusion comports with both Napster

24  decisions and with Religious Technology.[16] The Court finds the

25  ─────────────────

26      [16]See Napster II, 239 F.3d at 1022 (agreeing Napster
   provides "the site and facilities" for direct infringement
27  because without its services users could not find what they

28                          47

1  evidence before it supports the conclusion that Perfect 10 has a

2  strong likelihood of establishing material contribution by

3  Cybernet to activity that infringes Perfect 10's copyrights.

### c. Contributory Infringement – Conclusion

5     The Court therefore finds that there is at least a serious

6  question on the merits of Perfect 10's contributory infringement

7  claim against Cybernet prior to the filing of the present suit

8  and a strong likelihood of success on its claims stemming from

9  Cybernet's post-filing conduct.

### 3.    Vicarious Copyright Infringement

11    Courts have extended vicarious liability in the copyright

12  context to defendants that have (1) the right and ability to

13  exercise control over a directly infringing party and its

14  activities and (2) obtained a direct financial benefit from the

15  infringing activities. Fonovisa, 76 F.3d at 262.

### a.    Direct Financial Interest

17    Cybernet argues that it does not have a sufficiently direct

18  financial interest to be held liable for vicarious copyright

19  infringement. Opp'n at 22-23. The Court strongly disagrees.

20  Cybernet markets the Adult Check brand based on both the number

21  of images and their quality. Zadeh Decl., Ex. 4; Lane Decl. ¶¶

22  54, 57. Perfect 10 has brought forward evidence that it has sunk

23  significant resources into developing high-quality adult images.

24  Taking Perfect 10's allegations of 10,000 infringing images at

25  _____

26  wanted with the "ease of which defendant boasts"); Napster I, 114

    F. Supp. 2d at 919-20; Religious Technology, 907 F. Supp. at 1375

27  (denying defendant's motion for summary judgment on this issue).

28                                48

1  face value, as Cybernet does for purposes of this test, see Opp'n
2  at 22, Cybernet benefits from the draw posed by the existence of
3  these works provided at a cost far below that provided by the
4  copyright owner. See Fonovisa, 76 F.3d at 263-64; Lane Decl. ¶
5  81; see also Napster II, 239 F.3d at 1023 ("Ample evidence
6  supports the district court's finding that Napster's future
7  revenue is directly dependent upon 'increases in user base.' More
8  users register with the Napster system as the quality and
9  quantity of available music increases.") Cybernet benefits
10 directly from these infringing sites to the extent that they have
11 brought in new users because the new customers pay Cybernet
12 directly. In addition, there is the ancillary benefit brought in
13 by the incremental additional value these sites pose to
14 consumers, who gain access to all sites by paying the Adult Check
15 membership fee. Cf. Religious Technology, 907 F. Supp. at 1377
16 (granting defendant summary judgment where no evidence "that
17 Netcom's policy directly financially benefits Netcom, such as by
18 attracting new subscribers.") Moreover, the Court finds that
19 there is a strong likelihood that Perfect 10 will establish a
20 "symbiotic interest" between Cybernet and the infringing websites
21 based on the close interrelationship between Cybernet and its
22 affiliated websites, a relationship that appears to outside
23 consumers as if Adult Check constitutes a single brand. See Adobe
24 Systems, Inc. v. Canus Productions, Inc., 173 F. Supp. 2d 1044,
25 1051 (C.D. Cal. 2001)(discussing "symbiotic interest"). It should
26 be noted that all the money associated with these websites flows
27
28                                    49

1   directly to Cybernet before some of it is returned to the

2   individual site owners as "commissions." The Court concludes that

3   this evidence creates a strong likelihood Perfect 10 will

4   establish this direct financial interest.

5       Cybernet relies on Adobe Systems, 173 F. Supp. 2d at 1052,

6   to argue otherwise. Adobe Systems involves a copyright action

7   against the proprietor of weekly computer fairs where

8   approximately one hundred pirated copies of Adobe Systems

9   software were located at shows that averaged up to 15,000

10  attendees per weekend. Id. at 1047. On plaintiff's motion for

11  summary judgment the court discussed Fonovisa and its requirement

12  of direct financial benefit. Id. at 1050-53.

13      The Adobe Systems court read into Fonovisa's discussion of

14  vicarious liability a requirement to show "a direct financial

15  benefit to the defendant from the 'draw' of the infringing

16  products." Id. at 1050. At different points in the opinion this

17  idea was expressed in language such as:

18

19  •   "the sale of the counterfeit products must in fact be the

20      'draw' for customers to the venue." Id. at 1050 (emphasis

21      added).

22

23  •   "Plaintiffs must show that the vendor's infringement

24      constitutes a draw to the venue to the extent that the

25      economic interests of the direct infringer and those of the

26      landlord become closely intertwined." Id. at 1051.

27

28                              50

1

2    •    "[P]laintiff bears the burden of demonstrating a direct

3         financial benefit to the landlord from 'customers seeking to

4         purchase infringing recordings' and profits which 'flow

5         directly from customers who want to buy the counterfeit

6         recordings.'" Id. at 1050.

7

8    •    "Without the requirement that the counterfeit goods provide

9         the main customer draw, Fonovisa would "provide essentially

10        for the limitless expansion of vicarious liability into

11        spheres wholly unintended by the court." Id. at 1051

12        (emphasis added).

13

14   •    "Fonovisa found a symbiotic relationship existed between the

15        infringing vendors and the landlord because 'the very

16        success of the landlord's venture depends on the

17        counterfeiting activity (and thus the landlord has every

18        incentive to allow the activity to continue).'" Id. at 1051.

19

20   The Adobe Systems court then concluded that on the facts of the

21   case, where both the number of infringements and the apparent

22   impact of these infringements was small, there was not a

23   symbiotic relationship and that there were triable issues of fact

24   remaining as to whether the infringing products constituted a

25   draw. Id. at 1052.

26        Similarly in Religious Technology, the court found no

27

28                                     51

1    evidence of direct financial benefit for Netcom where it received

2    a fixed fee. 907 F. Supp. at 1376-77. The court also found that

3    there was no evidence that infringement by Netcom users enhanced

4    the value of Netcom's services to subscribers or attracted new

5    subscribers. Id. at 1377.

6        This case is unlike Religious Technology because Cybernet

7    receives more than a fixed fee. The income derived from each

8    website is directly based on the site's initial popularity. The

9    more consumers appreciate the content of a page, the more money

10   Cybernet receives. Cybernet's income stream pays no regard to a

11   site's respect for copyright or lack thereof. Additionally,

12   Cybernet (and Adult Check) depends on content to attract

13   consumers. Cybernet has given no reason to believe that these

14   pages do not attract consumers, thereby creating a financial

15   benefit to Cybernet.[17]

16       In comparison to Adobe Systems, the present facts pose a

17   closer question, however. Cybernet attempts to hide behind the

18   sheer volume of images on its sites to argue that even 10,000

19   infringing images does not establish a sufficiently direct

20   financial interest or relationship. Opp'n at 22. The Court

21   disagrees. In Adobe Systems, the court implied that the small

22   number of infringing articles was insufficient to support a

23   conclusion that these items provided "a significant draw"

24   bringing consumers to the fairs. 173 F. Supp. 2d at 1053. In

25

26       [17]Additionally, the participating websites actually pay no

27   fees to Cybernet. Instead they are paid by Cybernet.

28                                   52

1  contrast, the Court concludes that there is a strong likelihood

2  Perfect 10 will establish a large number of infringing sites. Cf.

3  Playboy v. Webbworld, 968 F. Supp. 1171, 1177 (finding sufficient

4  financial interest where defendants received a percentage of

5  fixed fee and there were sixty-seven infringing images on site).

6  The Court also concludes that the fortunes of these sites and

7  Cybernet are sufficiently tied to create the requisite direct

8  financial benefit. See Napster II, 239 F.3d at 1023. The Court

9  therefore concludes that Perfect 10 has shown a strong likelihood

10  of success as to the direct financial interest element of

11  vicarious liability.

12          **b.    Right or Ability to Control**

13      Cybernet argues that it lacks the right and ability to

14  control the websites because it cannot "affirmatively work as

15  some sort of Internet 'hall monitor,' policing an unruly class of

16  webmasters and responding instantaneously when any copyright

17  infringement occurs." Opp'n at 23. In making this argument, it

18  invokes the protection of the Digital Millennium Copyright Act's

19  "notice and taken-down" provision, which will be dealt with below

20  rather than addressed in this section. Its argument attempts to

21  distinguish the Adult Check system from Napster's system because

22  the images used in the Adult Check system do not pass through

23  Cybernet's hardware. Opp'n at 25. Further, Cybernet argues that

24  it is constrained in its right and ability to control by

25  requirements of actual notice. Id.

26      The notice argument is not relevant as it does not address

27

28

1   Cybernet's control abilities. Rather it addresses when those

2   abilities should be exercised. Focusing on the ability to control

3   the sites found in its system, the Court concludes that Perfect

4   10 has established a strong likelihood of success. As mentioned

5   earlier, Cybernet has a monitoring program in place. Under this

6   program, participating sites receive detailed instructions regard

7   issues of layout, appearance, and content. Cybernet has refused

8   to allow sites to use its system until they comply with its

9   dictates. Most importantly, it monitors images to make sure that

10  celebrity images do not oversaturate the content found within the

11  sites that make up Adult Check. Zadeh Decl., Ex. 30. It forbids

12  certain types of images. This ability to control other types of

13  images belies any attempt to argue that Cybernet does not

14  exercise sufficient control over its webmasters to monitor and

15  influence their conduct or to deny copyright offenders the

16  benefits of its service. See Religious Technology, 907 F. Supp.

17  at 1375 (right and ability to control where "police" powers

18  exercised in past); see also Napster I, 114 F. Supp. 2d at 920-21

19  (online services improved methods of blocking users "tantamount

20  to an admission that defendant can, and sometimes does, police

21  its service").

22      Cybernet, like the swap meet in Fonovisa, not only has the

23  right to terminate webmasters at will, it controls consumer

24  access, and promotes its services. See Fonovisa, 76 F.3d at 262;

25  Napster I, 144 F. Supp. 2d at 920. Combined with its detailed

26  policing of sites, these activities are sufficient to establish a

27

28                          54

1  strong likelihood of success for Perfect 10's argument that

2  Cybernet has the right and ability to control the participating

3  websites.

4              c.    **Vicarious Liability - Conclusion**

5      Because Perfect 10 has shown a strong likelihood of

6  establishing a direct financial benefit and the right and ability

7  to control websites that engage in infringing activity, the Court

8  finds there is a strong likelihood of success on Perfect 10's

9  claims for vicarious copyright infringement liability.

10              **4.    DMCA**

11      In 1998 Congress passed Title II of the Digital Millennium

12  Copyright  Act ("DMCA"), Pub. L.. 105-304, Title II, § 202(a),

13  112 Stat. 2877 (1998)(codified at 17 U.S.C. § 512). The DMCA

14  marked Congress' entry into the online copyright fray. The DMCA

15  created a series of four "safe harbors" to protect "providers of

16  online services" from liability, primarily monetary, based on

17  claims of copyright infringement attributable to the actions of

18  users. See 17 U.S.C. §§ 512(a)-(d),(j). In order to qualify for

19  these safe harbors, a provider of online services must:

20

21      1)    adopt a policy that provides for the termination

22            in appropriate circumstances of subscribers and

23            account holders of the service provider's system

24            or network who are repeat infringers;

25

26      2)    reasonably implement the policy; and

27

28                              55

1      3)    inform subscribers and account holders of the

2              service provider's system or network about the

3              policy.

4

5  See 17 U.S.C. § 512(i). The service provider and its policy must

6  also not interfere with "standard technical measures" used by

7  copyright owners to protect copyrighted works.[18] See 17 U.S.C. §

8  512(i)(1)(B).

9     These "safe harbors" do not affect the question of ultimate

10  liability under the various doctrines of direct, vicarious, and

11  contributory liability. See H.R. Rep. 105-551(II), at 50 (July

12  22, 1998); S. Rep. 105-190, at 19 (May 11, 1998). Rather they

13  limit the relief available against service providers that fall

14  within these safe harbors. See 17 U.S.C. §§

15  512(a),(b)(1),(c)(1),(d), & (j).

16     Of these "safe harbors," Cybernet only invokes the harbors

17

18  _____

    [18]The definition of standard technical measures includes a
19  requirement that they be "developed pursuant to a broad consensus
    of copyright owners and service providers in an open, fair,
20  voluntary, multi-industry standards process." 17 U.S.C. §
    512(i)(2)(A). There is no indication that the "strong urging" of
21  both the House and Senate committees reporting on this bill has
    led to "all of the affected parties expeditiously [commencing]
22  voluntary, inter-industry discussions to agree upon and implement
    the best technological solutions available to achieve these
23  goals." H.R. Rep. 105-551(II), at 61; S. Rep. at 52. It thus
    appears to be an open question if any conduct or policy could
24  interfere with "standard technical measures." See 3 Nimmer on
    Copyright § 12B.02[B][3], at 12B-29 ("Given the incentives of the
25  various parties whose consensus is required before any such
    technical measures can win adoption, it seems unlikely . . . that
26  the need for any such monitoring will eventuate.")

27

1   provided by section 512(c), governing information residing on the

2   systems or networks at the direction of users, and section

3   512(d), governing information location tools ("web browsers").

4   Moreover, these "safe harbors" could not apply prior to August 8,

5   2001, the date Cybernet adopted its policy it claims is aimed at

6   compliance with the DMCA. See Costar Group, Inc. v. Loopnet,

7   Inc., 164 F. Supp. 2d 688, 698 n.4 (D. Md. 2001).

8                  a.    Is Cybernet A "Service Provider"?

9        Cybernet devotes a single sentence to arguing that it is a

10  "service provider" as the term is defined in section

11  512(k)(1)(B). Opp'n at 25. This section defines a service

12  provider as a "provider of online services or network access, or

13  the operator of facilities therefor," and includes entities

14  "offering the transmission, routing, or providing of connections

15  for digital online communications, between or among points

16  specified by a user, of material of the user's choosing, without

17  modification to the content of the material as sent or received."

18  17 U.S.C. § 512(k). Section 512(k)(1)(B)'s definition has been

19  interpreted broadly. See ALS Scan, Inc. v. RemarQ Communities,

20  Inc., 239 F.3d 619, 623 (4th Cir. 2001); Hendrickson v. eBay, 165

21  F. Supp. 2d 1082, 1087 ("eBay clearly meets the DMCA's broad

22  definition of online "service provider"). Although there appears

23  to be uniform agreement that the definition is broad, or at least

24  broader than the definition of 512(k)(1)(A) concerning conduit-

25  type services, the Court has found no discussion of this

26  definition's limits.

27

28                                      57

1    Perfect 10 argues that section 512(c) was drafted with the

2  limited purpose of protecting Internet infrastructure services in

3  mind. Reply at 18. It contends that the definition for a provider

4  of online services or network access does not include services

5  that "participate in the selection or screening of that data or

6  take an interest in the content of that data." Id. at 18 n.19.

7  The inclusion of section 512(d) which creates a "safe harbor" for

8  copyright infringement resulting from the use of information

9  location tools by service providers, which include directories,

10  indexes, references, pointers and hypertext links, strongly

11  suggests that the definition of service provider is meant to

12  include services that only provide location service tools, as

13  well as services providing internet access and such tools. See

14  H.R. Rep. 105-551(II), at 58 (identifying Yahoo! as an example);

15  cf. also 47 U.S.C. § 231(b)(3)(reach of Child Online Protection

16  Act defined by similar categories). The Court adopts that reading

17  and will not use Perfect 10's proposed interpretation to evaluate

18  Cybernet's ability to invoke the protection of section 512's safe

19  harbors.

20    Nevertheless, Cybernet has made this a more complicated

21  issue than it probably should be by its insistence that it does

22  not host any infringing images and no image files pass through

23  any of its computers. Opp'n at 21. This appears to be part of an

24  overall strategy to deny that Cybernet is anything more than an

25  age verification service, somehow beyond the reach of copyright

26  law, with no responsibility for the actions taken on the sites of

27

28                                    58

1  the individual webmasters. It may be a close question whether

2  such a service qualifies as a "provider of online services."[19]

3  For the moment, however, the Court will assume that Cybernet is a

4  "provider of online services" as defined in section 512(k).

### b.   Does Cybernet Meet the Minimal Qualifications of Section 512(i)?

7  The initial hurdle Cybernet must meet in order to qualify

8  for section 512(k)'s restrictions on injunctive relief is found

9  in section 512(i). These provisions require an online service

10 provider to develop, promulgate and reasonably implement a policy

11 providing for termination in appropriate circumstances of repeat

12 copyright infringers. 17 U.S.C. § 512(i). In crafting these

13 policies, Congress has given a vague indication of what

14 constitutes "appropriate" circumstances.

15 In the House and Senate Reports considering this subsection,

16 both used identical language. See Ellison v. Robertson, - F.

17 Supp. 2d -, 2002 WL 407696 *1, *12 (C.D. Cal. 2002). The

18 Committees each "recognize[d] that there are different degrees of

19 on-line copyright infringement, from the inadvertent and

20

21    [19]Because Cybernet does run a web-page, adultcheck.com and
22 maintains computers to govern access to the Adult Check family's
   websites there is good reason to believe that it is an "online
23 service provider" under 512(k)(1)(B). Cf. 47 U.S.C.
   231(e)(mentioning broad range of online services that an
24 "Internet access service" could also provide); ALS Scan, 239 F.3d
   at 623; Hendrickson, 165 F. Supp. 2d at 1087. At the same time
25 the fact that no images pass through Cybernet's hardware makes
   Cybernet a poor fit for the categories established by the DMCA,
26 see 17 U.S.C. §§ 512(a)-(d), and Cybernet's service appears to
27 fall outside the parallel definitions of 47 U.S.C. 231(b).

28                               59

1  noncommercial, to the willful and commercial." H.R. Rep. 105-

2  551(II), at 61; S. Rep. 105-190, at 62. The Committees also

3  stated that the provision was not intended to undermine

4  principles governing knowledge of infringement and protection of

5  privacy rights "by suggesting that a provider <u>must</u> investigate

6  <u>possible</u> infringements, <u>monitor</u> its service, or make <u>difficult</u>

7  judgments as to whether conduct is or is not infringing." H.R.

8  Rep. 105-551(II), at 61 (emphasis added); S. Rep. 105-190, at 62

9  (same). The Committees than appeared to immediately qualify these

10 statements by stating: "However, those who repeatedly or

11 flagrantly abuse their access to the Internet through disrespect

12 for the intellectual property rights of others should know that

13 there is a <u>realistic</u> threat of losing that access." H.R. Rep.

14 105-551(II), at 61 (emphasis added); S. Rep. 105-190, at 62

15 (emphasis added).

16     Although the last sentence appears directed at the

17 instigators of infringement, each Committee also noted that the

18 DMCA preserves "strong incentives" for "qualifying" service

19 providers to cooperate with copyright holders. H.R. Rep. 105-

20 551(II), at 49; S. Rep. 105-190, at 20. The Court shares concerns

21 expressed by Nimmer and a sister court in this district in

22 recognizing the language of the statute and the legislative

23 history of this section are less than models of clarity. <u>See</u>

24 <u>Ellison</u>, - F. Supp. 2d at -, 2002 WL 406796 at *13 n.15 (treating

25 section 512(i) as a mere threat based on language and history); 3

26 <u>Nimmer on Copyright</u> § 12B.02[B][2], at 12B-25 & 12B-26

27

28                              60

(identifying questions left open by statute). Nevertheless, the Court reads section 512(i) to imply some substantive responsibilities for service providers, particularly if the statute is to be read with the apparently broad reach advocated by the other courts that have considered this section.

The legislative history does provide some guidelines as to what a section 512(i) policy might look like. The service provider might not need to provide for active investigation of possible infringement.[20] No court in construing these requirements should make the knowledge standards more demanding than those found in section 512(c). See H.R. Rep. 105-551(II), at 61. The service provider might not need to take action for isolated infringing acts by single users. See 17 U.S.C. § 512(i) (referring to repeat infringers). The service provider need not act or address difficult infringement issues. See H.R. Rep. 105-551(II), at 61. It may not require the service provider to actively monitor for copyright infringement. See id.

When confronted with "appropriate circumstances," however, such service providers should reasonably implement termination.

_____

[20]See H.R. Rep. 105-551(II), at 61. The statement above is qualified by the "standard technical measures" language in section 512(i), which may require such action. See H.R. Rep. 105-551(II), at 53 ("a service provider need not monitor its service or affirmatively seek facts indicating infringing activity (except to the extent consistent with a standard technical measure complying with new subsection [i])"). A failure to impose an affirmative duty on service providers to hunt out infringers does not mean, however, that copyright holders cannot investigate potentially infringing activities and notify providers under a "reasonably implemented" section 512(i) policy.

61

1  See 17 U.S.C. § 512(i). These circumstances would appear to

2  cover, at a minimum, instances where a service provider is given

3  sufficient evidence to create actual knowledge of blatant, repeat

4  infringement by particular users, particularly infringement of a

5  willful and commercial nature. See H.R. Rep. 105-551(II), at 61.

6  An evaluation of any such policy would be informed by an

7  awareness of the service provider's function, existing

8  technology, and the expressed Congressional desire not to

9  undermine the privacy and knowledge requirements of the statute,

10 while leaving the law in its "evolving state." See S. Rep. 105-

11 190, at 18.

12      This interpretation tracks that of the Costar court, which

13 found that there were material issues of fact whether a provider

14 of real estate services on the web implemented a "reasonable"

15 termination policy, as well as whether it acted expeditiously in

16 taking down access to infringing material under section 512(c).

17 See 164 F. Supp. 2d at 704. Under this reading, section 512(i) is

18 focused on infringing users, whereas 512(c) is focused primarily

19 on the infringing material itself. This line of reasoning becomes

20 particularly forceful when one considers the limitations on

21 injunctive relief found in section 512(l).[21]

22 _____

23      [21]Section 512(l) provides that a service provider under
   subsection (a) may only be restrained from providing access to an
24 infringer by terminating the account or from providing access to
   a specific, identified online location outside the United States.
25 See 17 U.S.C. 512(l)(B). There is no ability to order such a
   provider to take down material, presumably because such material
26 is no longer on the system. See 17 U.S.C. 512(a)(4)(limiting time
27 copy may reside on system to that "reasonably necessary for the

28                                    62

1    Making the entrance into the safe harbor too wide would

2  allow service providers acting in complicity with infringers to

3  approach copyright infringement on an image by image basis

4  without ever targeting the source of these images. See 17 U.S.C.

5  § 512(c)(1)(C)(only requiring service providers to remove or

6  disable access to the infringing material). It would encourage a

7  risk-taking approach, whereby service providers could allow

8  repeat infringers to flood the web with infringing images knowing

9  the service providers' ignorance of new infringements and the

10  limited relief under 512(l) would prevent anything more than

11  token action and no financial exposure, while the service

12  provider continues to profit on a "non-discriminatory" basis. The

13  incentives for such action were eloquently phrased by Cybernet in

14  support of its arguments why they should not be held accountable

15  for copyright infringement under the Adult Check brand: "a

16  webmaster will quickly switch from one [AVS] to another if he or

17  she feels the AVS is attempting to exert too much control over

18  the content of the participating sites." Lane Decl. ¶ 62.

19    The Court does not read section 512 to endorse business

20  practices that would encourage content providers to turn a blind

21  eye to the source of massive copyright infringement while

22  _____

23  transmission, routing, or provision of connections"). In
   contrast, service providers, as the term is defined for the other
24  three safe harbor provisions may be restrained from providing
   access to the material, providing system access to the infringer,
25  or such other injunctive relief as may be considered necessary to
   restrain infringement at a particular location, if it is the
26  least burdensome form of relief available to the service
   provider. See 17 U.S.C. § 512(l)(A).
27

28                                    63

continuing to knowingly profit, indirectly or not, from every
single one of these same sources until a court orders the
provider to terminate each individual account.[22] Cf. Costar, 164
F. Supp. 2d at 705 (restricting application of section 512's
"financial benefit" test). The Court does recognize that section
512(l) allows for court orders terminating user accounts, but it
also recognizes that online service providers are meant to have
strong incentives to work with copyright holders. The possible
loss of the safe harbor provides that incentive and furthers a
regulatory scheme in which courts are meant to play a secondary
role to self-regulation. See, e.g., 17 U.S.C. § 512(i)(2)(A). The
Court thus views 512(i) as creating room for enforcement policies
less stringent or formal than the "notice and take-down"
provisions of section 512(c), but still subject to 512(i)'s
"reasonably implemented" requirement. It therefore respectfully
parts ways with the interpretation of 512(i) in Ellison, in order
to maintain the "strong incentives" for service providers to
prevent their services from becoming safe havens or conduits for

---

[22]In response to the unstated premise of Cybernet's
arguments that enforcement of the Copyright Act would hurt its
business, but not address the ultimate source of the
infringement, the Court finds itself sympathetic to the
observation in Playboy v. Webbworld: "If a business cannot be
operated within the bounds of the Copyright Act, then perhaps the
question of its legitimate existence needs to be addressed." 968
F.Supp. at 1175. see also Napster II, 239 F.3d at 926 ("Although
even a narrow injunction may so fully eviscerate Napster, Inc. as
to destroy its user base . . . the business interests of an
infringer do not trump a rights holder's entitlement to copyright
protection.")

1 | known repeat copyright infringers, at the very least.[23]

2 | The allegations against Cybernet and the evidence before the

3 | Court is consistent with just such a jaded view of Cybernet's

4 | activities. Even in opposition, right after pointing out that

5 | "some number of webmasters have switched to other AVS vendors and

6 | some have even encouraged Cybernet's customers to cancel their

7 | subscriptions," Cybernet disclaims any intent to impose

8 | "impossible affirmative duties upon itself." Opp'n at 24. In the

9 | context of this litigation, the Court sees this as an implicit

10 | argument that rooting out repeat infringers imposes such

11 | "impossible" duties and finds it runs against Cybernet's argument

12 | that it is actually trying to cope with repeat infringers.

13 | In opposition to the present motion, Cybernet does assert

14 | that it has taken action against individual webmasters as well as

15 | against infringing sites. Umbreit Decl. ¶¶ 26-31. Cybernet has

16 | not, however, submitted any documentary evidence to support these

17 | assertions. Perfect 10's moving papers included examples of

18 | infringing conduct on sites that have been identified since the

19 | beginning of this litigation. Significantly, in its Opposition

20 | Cybernet maintains it does "what it has the power to do - namely,

21 | remove from the Cybernet search engine and links page any website

22 |

23 |

24 | [23]This case appears to offer an example of such behavior. In Perfect 10's Third Amended Complaint, it identified a site,

25 | www.celebpics.com, as one of the problematic Adult Check sites. In its preliminary injunction papers, Perfect 10 now complains

26 | about the website www.newcelebpics.com. See Zadeh Decl., Ex. 79. Although issues of ownership are unclear at this point, the

27 | inference of repeat activity is difficult to avoid.

28 |                                    65

about which it has received a notice of infringement," without addressing its power to stop providing its AVS service to known infringers. Opp'n at 12. The Court finds this lone declaration, unsupported by any documentary evidence, contradicted by evidence in the record, and flying in the face of Cybernet's consistent resistance to the proposition that it could, would or should exercise any control over its webmasters, simply not credible. The record supports the conclusion that Cybernet has taken great pains to avoid shouldering the burdens of the copyright regime, all the while profiting from pirates.[24]

Because the Court finds that there is a strong likelihood that Cybernet cannot establish that it has "reasonably implemented" a policy directed at <u>terminating</u> repeat infringers, even in "appropriate circumstances," there is little likelihood that it can avail itself of section 512's safe harbors.

          **c.    Could Cybernet qualify for the safe harbors**

                 **if it is a "service provider" and has "reasonably**

                 **implemented" a repeat infringer policy?**

Even assuming Cybernet could somehow bring itself over the section 512(k) and (i) hurdles to have its conduct evaluated under sections 512(c) and (d), the Court finds that there is a strong likelihood Perfect 10 will prevail on its copyright claims. First the Court notes that Cybernet's assertion that these sections could "exempt" Cybernet from liability is without

---

    [24]This conclusion, formed on the basis of Perfect 10's initial evidence and Cybernet's opposition, obviated any need to consider Perfect 10's reply exhibits.

1    merit. Section 512 does not affect the elements of copyright

2    liability. Instead, it affects the remedies available for any

3    infringement which might be found. The Court will nevertheless

4    address why it believes Cybernet does not comply with the

5    explicit substantive requirements of the DMCA or qualify for

6    either the section 512(c) ("information storage") or (d)

7    ("information location tool") safe harbors.

8                    **1. Deficiencies In Notice Procedures**

9        Both the section 512(c) and (d) safe harbors governing

10   information storage and connecting activity, such as link and

11   search engines, respectively, contain parallel notification and

12   counter-notification requirements in an attempt to balance the

13   duties of service providers, the rights of copyright owners and

14   the rights of other users. In general outline, the notice and

15   take-down provisions work as follows:

16

17

18       1)    A copyright owner must contact the service provider

19             and provide written notice meeting certain criteria,

20             see 17 U.S.C. § 512(c)(3);

21

22       2)    If the notice fails to fully comply with the stated

23             notice requirements, but substantially complies with

24             three requirements aimed at identifying infringing

25             sites, works and users, the service provider must

26             promptly attempt to contact the person complaining or

27

28                                      67

1  takes other reasonable steps to assist in the receipt

2  of notification that complies with the requirements,[25]

3  see 17 U.S.C. § 512(c)(3)(B);

4

5  3)  Once notice is received, the service provider must

6  expeditiously remove or disable access to the

7  material and must notify the affected user promptly,

8  see 17 U.S.C. § 512(c)(1)(B);

9

10  4)  The affected user may then submit a counter-

11  notification consisting of a statement, under

12  penalty of perjury, that the user had a good faith

13  belief that the material was removed as a result

14  of a mistake or misidentification of the material,

15  see 17 U.S.C. § 512(g)(3); and

16

17  5)  Upon receiving a counter-notification, the service

18  provider has 10-14 days to replace the material unless

19  the provider's designated agent receives notice that

20  the complaining party has filed a court action,

21  see 17 U.S.C. § 512(2)(C).

22

23  **a.  Deviations From Notice Requirements**

24  Cybernet's procedures depart from this statutory scheme in

25  _____

26  [25]The Court is inclined to read this "or" in the non-

27  exclusive sense.

28                                68

1  several quite significant ways. First, Cybernet's policy states

2  that it requires a complaint to meet all its stated notice

3  requirements and there is no indication that Cybernet tries to

4  work with parties whose notice falls within the statute's notice-

5  saving clause, section 512(c)(3)(B)(ii). Second, and even more

6  problematic, Cybernet has altered the notice requirements

7  themselves. Whereas section 512 states "if multiple copyrighted

8  works at a single online site are covered by a single

9  notification, a representative list of such works at that site"

10 must be provided, 17 U.S.C. § 512(c)(3)(A), Cybernet does not

11 appear to allow such a *representative* list, and it requests only

12 the specific web page at which a given work is located, rather

13 than the site. These apparently small differences might seem

14 innocent enough, but in the framework of this litigation it

15 appears to be an intent to upset the Congressionally apportioned

16 burden between copyright holder and service provider by placing

17 the entire burden on the copyright owner. These differences,

18 combined with the failure to show any flexibility on its policy

19 that a notification meet all of Cybernet's standards, leads the

20 Court to conclude that Cybernet has failed to structure a notice

21 system that complies with section 512.

22          b.    **Deviation From Counter-Notification Requirements**

23      The conclusion above is reinforced by Cybernet's counter-

24 notification requirements. The DMCA's counter-notification

25 statement, with its good-faith requirement stated under penalty

26 of perjury, separates good-faith infringers and innocent users

27

28                              69

1  from those who knowingly infringe copyrights. <u>See</u> 17 U.S.C. §

2  512(g)(3). This requirement implicates the "reasonably

3  implemented" policy of § 512(i) because there is an implication

4  that a party who cannot sign the required statement is a knowing

5  infringer. Thus, the counter-notification procedures appear to

6  serve the generally self-policing policy that section 512

7  reflects. Cybernet's counter-notification procedures allow

8  knowing infringers to sidestep this requirement.

9       By stating under penalty of perjury that they removed the

10  named infringing material, a knowing infringer will be

11  reestablished on the Adult Check system. <u>See</u> Zadeh Decl., Ex. 1

12  at 23. On the one hand, this makes sense to the extent that Adult

13  Check can only disable individual pages or sites because it

14  cannot directly access the content. On the other hand, this also

15  allows Cybernet to reinstate an infringer without the

16  Congressionally-required statement and provides cover for

17  Cybernet to water down its termination policy by treating these

18  minimalist take-down statements as neither an admission nor a

19  denial of the copyright infringement allegations, regardless of

20  how blatant the infringement might be. Although there is no

21  evidence on this issue, the record before the Court provides

22  substantial evidence of resistance on Cybernet's part towards

23  addressing copyright violations by its "unruly" webmasters. The

24  DMCA is a carefully-balanced, although sometimes unclear, piece

25  of legislation. <u>See</u> <u>Ellison</u>, - F. Supp. 2d -, 2002 WL 407696 at

26

27

28                                    70

1  *15 n.16.[26] Cybernet's DMCA "variant" appears to upset that

2  balance.

### 2. Direct Financial Benefit and Right and Ability to Control

5  Both relevant sections exclude from the safe harbor service

6  providers that "receive a benefit directly attributable to the

7  infringing activity, in a case in which the service provider has

8  the right and ability to control such activity." 17 U.S.C. §

9  512(c)(1)(B),(d)(2). Here, there is significant evidence that

10 Cybernet receives a direct financial benefit. See supra.

11  In Costar Group, 164 F. Supp. 2d at 704-05, the district

12 court found that a real estate website, which charged the same

13 price to infringing and non-infringing users and did not charge

14 for the service where the infringement was found, did not receive

_____

16  [26]The differences between 512(a) and (c), particularly
section 512(a)'s lack of any take-down requirement and its
17 limitation of injunctive relief to banning users may be traceable
to its language limiting the safe harbor to those situations
18 where "no such copy is maintained on the system or network in a
manner ordinarily accessible to such anticipated recipients for a
19 longer period than is reasonably necessary for the transmission,
routing or provision of connections." Cf. Religious Technology,
20 907 F. Supp. at 1370, 1375 (rejecting direct liability theory
based on eleven day storage, but allowing contributory liability
21 theory to go to jury); cf. also 17 U.S.C. § 512(n) ("Subsections
(a),(b),(c), and (d) describe separate and distinct functions"
22 but failure to qualify for one safe harbor "shall not affect a
determination of whether that service provider qualifies for the
23 limitations" under other categories). Thus, (a) and (c) might be
read as the difference between basic infrastructure transmission
24 functions and storage functions, with some service providers
engaging in both at the same time. But see Ellison, - F. Supp. 2d
25 -, 2002 WL 407696 at *14 (C.D. Cal. 2002)(adopting different
interpretation).

1  a sufficiently direct benefit to fall within the statute. Id. In

2  so concluding, the Court distinguished the Fonovisa line of cases

3  discussed previously by looking to the slightly different

4  language of the statute ("does not receive a financial benefit

5  directly attributable to the infringing activity") and, once

6  again, the legislative history of the DMCA. See id. at 705.

7      This legislative history states:

8

9      In determining whether the financial benefit criterion

10     is satisfied, courts should take a common-sense, fact-

11     based approach, not a formalistic one. In general, a

12     service provider conducting a legitimate business would

13     not be considered to receive a "financial benefit

14     directly attributable to the infringing activity" where

15     the infringer makes the same kind of payment as non-

16     infringing users of the provider's service. . . . It

17     would however, include any such fees where the value of

18     the service lies in providing access to infringing

19     material.

20

21 H.R Rep. 105-551(II), at 54.

22     The Costar court looked at the fact that neither infringing

23 nor non-infringing users paid anything for the service and

24 concluded that the direct financial benefit was lacking. Id. at

25 705. The Court expresses no opinion on the question whether the

26 "directly attributable" language is narrower or equivalent to the

27

28                              72

1  general vicarious infringement requirements. Rather, the direct

2  flow of income to Cybernet based on the number of new Adult Check

3  users that sign up to Adult Check from infringing sites

4  establishes that direct relationship. See supra. The more new

5  visitors an infringing site attracts, the more money Cybernet

6  makes. This is quite different from the situation in Costar where

7  the site made money on other services it offered, which were not

8  directly tied to the infringing activity. See 174 F. Supp. 2d at

9  704. Applying the common-sense, fact-based approach, the Court

10 finds that the financial benefit is highly likely to be

11 sufficiently direct to work against Cybernet's reliance on the

12 safe harbor.

13      Similarly, with regard to the right and ability to control,

14 the Court agrees with the Hendrickson and Costar courts that

15 closing the safe harbor based on the mere ability to exclude

16 users from the system is inconsistent with the statutory scheme.

17 See Hendrickson, 165 F. Supp. 2d at 1093-94; Costar, 164 F. Supp.

18 2d at 704.  As mentioned earlier, section 512 is meant to

19 encourage some level of copyright enforcement activity by service

20 providers, not to punish it. In the parlance of contributory

21 patent infringement cases dealing with the intent requirement for

22 contributory liability of trademark licensors, there must be

23 "something more."[27] Here Cybernet prescreens sites, gives them

24 _____

25      [27]See LA Gear, Inc. v. E.S. Originals, Inc., 859 F. Supp.
   1294, 1301 (C.D. Cal. 1994). Although the Court recognizes the
26 contexts are very different - one dealing with intent, one with
   control - this indefinite language trying to identify when there
27 is sufficient involvement to infer either, adequately captures

28                                  73

1  extensive advice, prohibits the proliferation of identical sites,
2  and in the variety of ways mentioned earlier exhibits precisely
3  this slightly difficult to define "something more."

4    This combination of financial benefit and ability to control
5  makes it highly unlikely that Cybernet may avail itself of the
6  DMCA safe harbor provisions.

7     **3.    Failure to Provide Evidence of Expeditious**
8       **Removal**

9    Additionally, there is no credible evidence presented to the
10  Court that Cybernet has ever *expeditiously* removed infringing
11  material from its system, disabled links, or altered its search
12  engine under its variant of the DMCA policy. Thus, this lack of
13  evidence also defeats Cybernet's likelihood of success in trying
14  to fit into the safe harbor.

15     **4.    Conclusions Relevant to Both Safe Harbors**

16    The Court therefore finds that there is little likelihood
17  that Cybernet will qualify for either the information location
18  tool or information storage safe harbors.

19     **5.    Copyright Infringement Conclusion**

20    Based on the previous discussion, the Court concludes that
21  Perfect 10 has established a strong likelihood of success for its
22  claims that Cybernet is liable for contributory and vicarious
23  copyright infringement, and has a strong likelihood of showing
24  Cybernet cannot avail itself of section 512's safe harbors. There
25  is, however, a residual chance that Cybernet will qualify for 17

26  _____

27  the nature of the inquiry.

28          74

1  U.S.C. § 512(d)'s safe harbor for search engines, but not links.

2      **B.    Likelihood of Success on Unfair Competition Claims**

3          Perfect 10's unfair competition claims under California

4  Business & Professions Code § 17200 ("section 17200") primarily

5  descend from allegations concerning various rights of publicity.

6  Perfect 10 argues these claims implicate both the "unlawful" and

7  "unfair" prongs of section 17200.[28] See Cel-Tech Communications,

8  Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 181

9  (1999)(discussing various prongs of unfair competition statute).

10 These rights of publicity claims are asserted on behalf of two

11 groups, Perfect 10 models who have assigned their publicity

12 rights to Perfect 10, and other unaffiliated persons, primarily

13 celebrities.

14      **1.    Rights of Publicity - Perfect 10 Models**

15         California recognizes two causes of action based on rights

16 of publicity. The first is a common law right that has been

17 recognized since 1931. Gionfriddo v. Major League Baseball, 94

18 Cal. App. 4th 400, 408 (Cal. App. 2001). The elements of this

19 right are:

20

21

22     1)    the defendant's use of the plaintiff's identity;

23     2)    the appropriation of plaintiff's name or likeness

24            to defendant's advantage, commercially or otherwise;

25  _____

26      [28]In light of its conclusions below, the Court need not

27 address the "fraudulent" arm of the statute.

28                                    75

1      3)    lack of consent; and

2      4)    resulting injury.

3

4 Id. at 409. The common law right also requires that this right

5 "be balanced against the public interest in the dissemination of

6 news and information consistent with the democratic processes

7 under the constitutional guaranties of freedom of speech and of

8 the press." Id. (citations omitted).

9     In addition, California has a statutory right, codified at

10 California Civil Code § 3344 ("section 3344"). Section 3344

11 provides:

12

13     Any person who knowingly uses another's name . . .

14     photograph, or likeness, in any manner, on or in

15     products, merchandise, or goods, . . . without such

16     person's prior consent, . . . shall be liable for any

17     damages sustained by the person or persons injured as a

18     result thereof.

19

20 Cal. Civ. Code § 3344. For purposes of the statute, a use of a

21 name, image and likeness in connection with any news or public

22 affairs broadcast does not constitute a use for which consent is

23 required. Cal. Civ. Code § 3344(d). Additionally, the section

24 does not apply to the owners or employees of any medium used for

25 advertising, unless the owners or employees have knowledge of an

26 unauthorized use. Cal. Civ. Code § 3344(f).

27

28                76

1  Neither party contests that third parties operating under

2  the Adult Check name have infringed the rights of publicity

3  assigned to Perfect 10 by a number of models. Nor does either

4  party suggest that direct liability would not be appropriate

5  against those third-parties under either theory. Similarly,

6  Perfect 10 does not assert any direct liability theory against

7  Cybernet. The likelihood of success thus boils down to a question

8  of "aiding and abetting."

9  **a.    Could Aiding and Abetting Liability Exist?**

10  California has adopted the joint liability principle laid

11  out in the Restatement (Second) of Torts § 876.[29] Under the

12  Restatement,

13

14  For harm resulting to a third person from the tortious

15  conduct of another, one is subject to liability if he:

16

17  a)    does a tortious act in concert with the other

18        in pursuit to a common design with him,

19        or

20  b)    knows that the other's conduct constitutes a

21        breach of duty and gives substantial

22

23  ─────────────

24  [29]See <u>Pasadena Unified School Dist. v. Pasadena Fed. of
Teachers</u>, 72 Cal. App. 3d 100, 113 (1977), *overruled on other
grounds*, <u>City & County of San Francisco v. United Ass'n of
Journeyman & Apprentices</u>, 42 Cal. 3d 810, 812 (1986)(as general
principle for intentional torts); <u>Saunders v. Superior Court</u>, 27
Cal. App. 4th 832, 846 (1994)(as principle for unfair competition
claims).

25

26

27

28                                77

1                    assistance or encouragement so to conduct

2                    himself, or

3      c)     gives substantial assistance to the other in

4                    accomplishing a tortious result and his own

5                    conduct, separately considered, constitutes

6                    a breach of duty to the third person.

7

8 Restatement (Second) of Torts § 876.

9     Cybernet argues that there is no case directly recognizing

10 the applicability of this doctrine to the right of publicity

11 torts. Opp'n at 28. The Court finds this argument unpersuasive,

12 as the Restatement provides a background principle for all tort

13 liability in the state of California. See Saunders, 27 Cal. App.

14 4th at 846.

15     Nor does the Court find convincing Cybernet's argument that

16 the right of publicity itself contains an actual knowledge

17 requirement. Opp'n at 28. Cybernet's citations refer to the

18 requirement that broadcasters of advertisements must have actual

19 knowledge before they can be held liable. See Cal. Civ. Code §

20 3344(f). Cybernet does not claim to be a medium used for

21 advertising, and the Court only focuses on rights of publicity

22 infringements located on the websites, not infringements

23 associated with webmaster banner ads. Rather, Cybernet argues

24 that the knowledge requirement of section 3344(f) is a

25 requirement for "aider and abettor" liability under the statute.

26     The Court concludes otherwise. Although section 3344(f)

27

28                             78

1 | provides clear evidence that secondary liability can be imposed
2 | for violations of publicity rights, it also provides evidence
3 | that the California legislature created a heightened knowledge
4 | requirement limited to broadcasters of advertisements. See, e.g.,
5 | TRW, Inc. v. Andrews, 534 U.S. 19 (2001)(applying the "expressio
6 | unius est exclusio alterius" canon). The California legislature
7 | has not extended this requirement to defendants like Cybernet.
8 | Cf. Newcombe v. Adolf Coors Co., 157 F.3d 686, 694 (9th Cir.
9 | 1998)(allowing claim to proceed against company and ad agency
10 | where another artist created work). The Court therefore defaults
11 | to the background assumption that secondary liability exists and
12 | it is found in conformance to the requirements established in the
13 | Restatement.

14 |

15 |          b.    Is Secondary Liability Likely to Exist?

16 |      Perfect 10 has primarily focused its secondary theory of
17 | liability on the second branch of the Restatement, requiring
18 | actual knowledge of the tortious conduct and substantial
19 | participation. Mot. at 32-35. The Court agrees with Perfect 10
20 | that there is a serious question on the merits of the substantial
21 | participation prong. As it stands, in the absence of argument to
22 | the contrary, the Court looks to the contributory infringement
23 | framework of copyright trademark law, where it has already found
24 | just such participation, thus leading the Court to conclude
25 | Perfect 10 has established a strong likelihood of success with
26 | regard to Cybernet's substantial participation. See supra. The

27 |

28 |                              79

1 Court recognizes, however, that the substantial participation

2 requirement has not been a particular subject of discussion among

3 the California courts, and the parties have not done more than

4 refer to the issue in passing.[30]

5      Perfect 10 also points to the notification it provided

6 Cybernet covering rights of publicity being violated by websites

7 in the Adult Check network. Mot. at 35. In response Cybernet

8 argues perfunctorily that Perfect 10 has not shown that the

9 owners of Cybernet had knowledge of the unauthorized use of

10 Perfect 10 model images. Opp'n at 28. The Court fails to grasp

11 the significance of the owners' knowledge absent an assertion

12 that Cybernet is an advertising medium, an assertion that the

13 present record would not support. As to Perfect 10 carrying its

14 burden to show actual knowledge, the Court finds that the

15 notification provided Cybernet by the Second Amended Complaint,

16 especially when supplemented by the physical examples of alleged

17 violations provided in a July 12, 2001 letter to Cybernet's

18 counsel, see Mausner Decl., Ex. 47, filed In Support of Pl. Opp'n

19 to Mot. to Dismiss, Aug. 9, 2001, is enough to create a strong

20 likelihood that Perfect 10 will prevail in showing actual

21 knowledge on Cybernet's part.

22      The Court finds the likelihood of success with regard to

23 both elements of the Restatement test creates a strong likelihood

24 that Perfect 10 will succeed on its unfair competition claim to

25

26      [30]The Court thus reserves the right to revisit this issue at

27 a later time.

28                                    80

1  the extent it predicates liability on an aiding and abetting

2  theory for the violation's of Perfect 10's rights of publicity.

3              2.    **Secondary Liability for Violating the Rights**

4                    **of Publicity of Other Celebrities**

5      Perfect 10 has also argued that Cybernet violates the

6  publicity rights of third-party celebrities by tolerating the

7  presence of fake nude pictures that either claim to be actual

8  pictures of these celebrities or that advertise themselves as

9  "fakes." Mot. at 31.

10                   a.    **Standing**

11     In an earlier order, the Court found that Perfect 10 had

12 adequately plead constitutional standing to assert these rights

13 under the unfair competition statute. See Perfect 10, Inc. v.

14 Cybernet Ventures, Inc., 167 F. Supp. 2d 1114, 1125 (C.D. Cal.

15 2001). Then in a subsequent order, the Court addressed the

16 prudential limitations on standing by reading Perfect 10's

17 complaint as one directed primarily at protecting its own

18 interests and not necessarily vindicating the rights of third-

19 parties. See Motion Granting in Part and Denying in Part Second

20 Motion to Dismiss at 21 ("2d MTD Order"). This running battle

21 over standing continues in the present motion.

22     Cybernet argues that Perfect 10 lacks standing because it is

23 not a competitor of Adult Check. Opp'n at 32. Cybernet makes this

24 argument by mischaracterizing the plain language of Perfect 10's

25 contentions in a state court action. See Jenal Decl., Ex. A at 7

26 (state court brief). This parallel case concerned Perfect 10's

27

28                              81

1  access to former Cybernet employees, presumably contacted for

2  purposes of investigating the facts underlying this action.

3  Cybernet does not quote the relevant language in full in its

4  papers, but it does assert that "As a factual matter, Perfect 10

5  admits it is not Cybernet's competitor." Opp'n at 32. The Court

6  finds that, as a factual matter, this is simply incorrect.

7      The unquoted portion of the brief states:

8

9      The fact that Perfect 10 does not compete against

10     Cybernet for the purpose of trade secret law *does not*

11     *mean that Cybernet cannot be sued by Perfect 10 in the*

12     *federal action for unfair competition*[.] Cybernet

13     permits and assists its Adult Check Websites to steal

14     photos and images from Perfect 10 magazine and

15     <www.perfect10.com. and unlawfully display those photos

16     and images. It also provides consumer access to that

17     stolen property for a fee.

18

19  Jenal Decl., Ex. A at 7 (emphasis added).

20      The Court finds this mischaracterization to be fairly

21  blatant and it plays into the Court's concerns over the

22  credibility of Cybernet's declarants.[31] Moreover, the Court has

23  ──────────────

24      [31]In the interest of fairness, the Court notes that Perfect
    10 has also on occasion been known to adopt strained readings in
25  support of its position. See Mot. at 22 (reading Cybernet's
    instructions to webmasters to "sell sizzle, not steak" as advice
26  to show improper pictures to prospective customers before they
    log onto Adult Check). Nevertheless, Cybernet has shown a much

28                                  82

1  concerns about Cybernet playing "fast and loose" with its

2  assertions, and warns Cybernet that judicial estoppel is a

3  doctrine that may not work to its benefit.

4      Turning to the merits, Cybernet and Perfect 10 both compete

5  for consumers' adult entertainment viewing dollars. They both

6  peddle images on the web in an industry where, by Cybernet's own

7  admission, price counts. The Court finds this is a strong

8  indication of competition, particularly where Adult Check

9  webmasters attract consumers using Perfect 10's own material. Cf.

10  Brookfield Communications, Inc. v. West Coast Entertainment

11  Corp., 174 F.3d 1036, 1063-65 (9th Cir. 1999)(discussing initial

12  interest confusion). Because the record supports a finding of

13  competition and Cybernet has raised no other arguments, the Court

14  finds that Perfect 10 has met Cybernet's current standing

15  challenge.

16          b.    Likelihood of Success - Third Party Rights

17      As this again disposes of the standing issues raised by the

18  parties, the Court then turns to the question of Perfect 10's

19  likelihood of success when it comes to third-party rights of

20  publicity. There are two relevant classes of celebrities - those

21  that have complained to Cybernet and those that have not. Mindful

22

23  ─────────────────

   greater tendency to make assertions that simply cross the line of
24  credulity. Compare First Mot. to Dismiss at 13 ("Quite frankly,
   given the nature of the entertainment business, it would seem
25  that there is no such thing as bad publicity for these kinds of
   people [referring to celebrities.]") with Rudolph Decl., Ex. A,
26  filed Dec. 3, 2001 at 9-10 (graphic depiction of pop star in
27  digitally-altered "action shot").

1   of the prudential limitations on standing despite Perfect 10's

2   status as Cybernet's competitor, see Viceroy Gold Corp. v. Aubry,

3   75 F.3d 482, 488 (9th Cir. 1995), the Court concludes that

4   Perfect 10 only stands a likelihood of success on its claims of

5   unfair competition for those celebrities who have already

6   complained to Cybernet about unauthorized uses of their publicity

7   rights.[32]

8       The Court finds that there are indeed celebrities who have

9   complained to Cybernet about uses of their images. See Milano

10  Decl. Cybernet has not made any argument that it has taken any

11  actions to remove these offending images or sites from its

12  service. This combination of actual knowledge, acceptance of the

13  benefits from these sites, and lack of action, if proved at

14  trial, which the Court finds likely, would expose Cybernet to

15  aiding and abetting liability for these celebrity images as well.

16  See supra. Limited to those celebrities who have complained about

17  _____

18      [32]The Court finds the differences in proof between those who
    have complained and those who have not will strongly effect the
19  likelihood of success. Further, this ensures that there is a
    sufficient unity of interest and that the use of any image is
20  truly "unfair" and/or "unlawful." See Viceroy Gold, 75 F.3d at
    488 (goal of third-party standing is to avoid adjudicating rights
21  a third-party might not wish to assert and to ensure effective
    advocacy). To the extent third-party standing is implicated, both
22  goals recognized in Viceroy are met once a person has complained
    about use of their image. Although the relationship between
23  Perfect 10 and those who have complained is not close, based on
    the evidence before the Court, their interests align and the
24  ability of these third-parties to assert their rights is severely
    hindered by the architecture of Cybernet and the internet. This
25  is evidenced by the large investment of time and resources
    devoted by Perfect 10 to identifying individual images and sites
26  for this litigation.
27

1  use of their images and identities, the Court therefore finds a

2  strong likelihood that Perfect 10 will succeed on its claim

3  against Cybernet based on the violations of third-party

4  celebrities' publicity rights. This predicate act also provides a

5  strong likelihood of success for Perfect 10's unfair competition

6  claim.

7      3.   **Ultimate Likelihood of Success on Unfair Competition**

8           **Claim**

9      The Court concludes that the likelihood of success on these

10  right of publicity claims creates a high likelihood of success on

11  both the "unlawful" and "unfair" prongs of California's unfair

12  competition statute, section 17200. See <u>Sun Microsystems, Inc. v.</u>

13  <u>Microsoft, Inc.</u>, 87 F. Supp. 2d 992, 999 (N.D. Cal.

14  2000)(discussing similar competitive injury sufficient to meet

15  "unfair" prong as "incipient violation of antitrust laws"); <u>Cel-</u>

16  <u>Tech</u>, 20 Cal. 4th at 180 (discussing "unlawful" prong).

17     The Court recognizes that application of secondary liability

18  principles is particularly applicable for claims of unfair

19  competition, as the California Supreme Court recognized as far

20  back as 1935: "When a scheme is evolved which on its face

21  violates the fundamental rules of honesty and fair dealing, a

22  court of equity is not impotent to frustrate the consummation

23  because the scheme is an original one." <u>American Philatelic Soc'y</u>

24  <u>v. Claibourne</u>, 3 Cal. 2d 689, 698-99 (1935).

25     In <u>American Philatelic</u>, a purveyor of stamps altered his

26  normal stamps to resemble rare perforated stamps. <u>Id.</u> at 692. He

27

28                                85

1 │ then sold these stamps to stamp dealers with clear notice that

2 │ the stamps were not of the rare variety. <u>Id.</u> at 694.

3 │ Nevertheless, his sales brochures and pricing established that he

4 │ both anticipated and effectively encouraged these dealers to sell

5 │ the stamps to the public as rare stamps. <u>Id.</u> The California

6 │ Supreme Court had no problem finding these claims stated a claim

7 │ under the unfair competition law. <u>Id.</u> at 697. <u>Saunders</u>, <u>American</u>

8 │ <u>Philatelic</u>, and <u>Cel-Tech</u>'s quotation of <u>American Philatelic</u>'s

9 │ equity language reinforce the Court's conclusion that Perfect

10 │ 10's theory of aiding and abetting liability for Cybernet based

11 │ on third-party violations of various rights of publicity has a

12 │ strong likelihood of success.[33]

13 │ **C.    TRADEMARK INFRINGEMENT**

14 │     **1.    Elements of Trademark Infringement**

15 │     In order for Perfect to prevail on its trademark claim

16 │ Perfect 10 must show:

17 │

18 │     1)    that a mark is owned and associated with Perfect 10;

19 │           and

20 │     2)    the defendants' use of the mark is likely to cause

21 │

22 │ ────────────

23 │     [33]The Court finds <u>Emery v. Visa Int'l Serv. Assoc.</u>, 95 Cal.
App. 4th 952 (2002), is not applicable to the present situation.

24 │ In <u>Visa</u> the alleged unfair practice involved a duty to
investigate the truth of statements made by others -- a duty

25 │ specifically defeated by California case law, Visa's lack of
control, and an alleged unlawful act that involved a violation of

26 │ California's Penal Code. Cybernet's power to police extends much
farther than the policing of one's mark referred to in <u>Visa</u> and

27 │ the predicate acts are based on civil doctrines of liability.

28 │                                86

1          confusion or mistake among the general public.

2

3  Sega Enterprises, Ltd. v. MAPHIA, 948 F. Supp. at 936.

4          **2.   Perfect 10's Trademark and Service Mark**

5          Perfect 10 has brought forward its trademark and service

6  mark registration certificates. Mausner Decl., Ex. B at 59, 62.

7  This is *prima facie* evidence of the validity of the trademark,

8  Perfect 10's ownership of the mark, and its exclusive right to

9  use the mark. 15 U.S.C. § 1057(b). At the same time, Perfect 10

10 has asserted that it has trademark rights in the names of its

11 models, but has not adequately established this fact.[34] See Mot.

12 at 10. The Court therefore restricts its discussion to the

13 "Perfect 10" trademark.

14          **3. Direct Infringement - Standards**

15         Perfect 10 advances two theories of trademark infringement

16 that it claims are widespread on the Adult Check websites:

17 unauthorized usage of its actual trademark and reverse palming

18 off. Mot. at 39.

19         Section 1114 of the Lanham Act prohibits the use of "any

20 reproduction, counterfeit, copy or colorable imitation of a

21 registered mark in connection with the sale, offering for sale,

22 distribution, or advertising of any good for services or in

23 connection with such use [when such use] is likely to cause

24 confusion." The statute is intended to protect consumers against

25 ──────────────

26     [34]Perfect 10 has produced assignments of "any" trademark
   rights owned by the models, but has failed to present any
27 evidence that they had trademark rights to give.

28                              87

1   deceptive designations of the origin of goods, as well as

2   preventing the duplication of trademarks. <u>Westinghouse Elec.</u>

3   <u>Corp. v. General Circuit Breaker & Elec. Supply, Inc.</u>, 106 F.3d

4   894, 899 (9th Cir. 1997). Direct usage of a mark by unauthorized

5   users can lead to the public's belief that the mark's owner

6   sponsors or otherwise approves of the use of the trademark.

7   <u>Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.</u>, 604

8   F.2d. 200, 204 (2d Cir. 1979). This can satisfy the likelihood of

9   confusion and can justify a court granting injunctive relief. <u>See</u>

10  <u>id.</u> at 204-205.

11      Reverse passing off occurs when someone markets a product as

12  their own, although the product was created by someone else. <u>See</u>

13  <u>Summit Machine</u>, 7 F.3d at 1437, 1441. This doctrine has been

14  limited to situations of bodily appropriation. <u>Shaw v. Lindheim</u>,

15  919 F.2d 1353, 1364 (9th Cir. 1990).[35] Bodily appropriation is

16  defined in the copyright context as "copying or unauthorized use

17  of substantially the entire item." <u>See</u> <u>Cleary v. News Corp.</u>, 30

18  F.3d 1255, 1261 (9th Cir. 1994). In the context of reverse

19  palming off, this definition is useful because it recognizes that

20  slight modifications of a product might cause customer confusion,

21  while products which are merely generally similar will not. <u>Id.</u>

22      **4.    Direct Infringement - Likelihood of Success**

23      Perfect 10 has brought forward evidence that a number of

24  Adult Check webmasters engage in both forms of trademark

25  ────────────────

26      [35]The considerations under California state law for reverse
    palming off are the same as they are for reverse palming off
27  under the Lanham Act. <u>See</u> <u>Summit Machine</u>, 7 F.3d at 1441-42.

28                              88

1 infringement. The Court therefore finds that there is a strong

2 likelihood that Perfect 10 will establish direct infringement by

3 individual Adult Check webmasters.

4 **5.    Contributory Infringement**

5 Perfect 10 does not maintain that Cybernet has directly

6 infringed its trademark. Rather, it relies on a theory of

7 contributory liability. Contributory liability may be imposed

8 where the defendant: (1) intentionally induces another to

9 infringe on a trademark or (2) continues to supply a product

10 knowing that the recipient is using the product to engage in

11 trademark infringement. Fonovisa, 76 F.3d at 264. Perfect 10 does

12 not argue that Cybernet intentionally induced the infringement

13 and Cybernet correctly points out there is no evidence of such

14 intentional inducement. Opp'n at 29. This brings the Court to the

15 second method of establishing contributory infringement.

16 The Ninth Circuit has recognized that courts must consider

17 the extent of control exercised by a defendant over a third-

18 party's means of infringement when dealing with the second test

19 and the fact pattern does not fit well into the "product" mold.

20 Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980,

21 984 (9th Cir. 1999). Thus direct control and monitoring of the

22 instrumentality used by a third-party to infringe the plaintiff's

23 mark can lead to liability. Id. These considerations are similar,

24 if not completely equivalent, to the principles applicable in the

25 copyright context. See Fonovisa, 76 F.3d at 265.

26 Although trademark liability is more narrowly circumscribed

27

28                                      89

1  than copyright liability, similar principles underlie

2  contributory trademark infringement. See Fonovisa, 76 F.3d at

3  265. This second test can be met where one knows or has reason to

4  know of the infringing activity, and it specifically covers those

5  who are "willfully blind" to such activity. Id.

6      Cybernet maintains that there is no evidence that Cybernet

7  had knowledge of the trademark infringement. Although the

8  evidence is not as clear cut as Cybernet maintains, Perfect 10

9  does not contest the point. The Court therefore declines to

10  express a view on the strength of Perfect 10's evidence with

11  regard to contributory trademark infringement.

12          **6.  Trademark Conclusion**

13      Because Perfect 10 has insufficiently asserted its argument

14  against Cybernet for trademark infringement, the Court declines

15  to find a strong likelihood of success at this point.

16  **D.  CONCLUSIONS - LIKELIHOOD OF SUCCESS**

17      Perfect 10 has:

18

19      1)    not established a strong likelihood of success on its

20            direct copyright infringement claims against Cybernet;

21      2)    established a strong likelihood of success on its

22            contributory infringement claims against Cybernet;

23      3)    established a strong likelihood of success on its

24            vicarious infringement claims against Cybernet;

25      4)    established a strong likelihood of success on its

26            unfair competition claims against Cybernet based on

27

28                              90

1      rights of publicity assigned to Perfect 10;

2   5)   established a strong likelihood of success on its

3        unfair competition claims against Cybernet based on

4        violations of third-party rights of publicity where

5        those third-parties have complained to Cybernet about

6        use of their images or identities by affiliated Adult

7        Check webmasters;

8   6)   has not established a likelihood of success on its

9        trademark claims against Cybernet.

10

11  **VII. UNCLEAN HANDS?**

12      Cybernet contends that even if the Court could find that

13  Perfect 10 has raised serious issues or a strong likelihood of

14  success over its various claims, the Court should deny injunctive

15  relief because of Perfect 10's "unclean hands." Opp'n at 38-39.

16  The unclean hands doctrine may apply when the alleged misconduct

17  occurs in a transaction directly related to the matter before the

18  court and the conduct affects the equitable relationship between

19  the litigants. Newman v. Checkrite Cal., Inc., 912 F. Supp. 1354,

20  1376 (E.D. Cal. 1995).

21      Cybernet points to two websites, www.celebshop.com and

22  www.celebritypictures.com, which contain Perfect 10 advertising

23  banners. Opp'n at 38-39. Both websites, true to their names,

24  contain the same type of pictures that Perfect 10 has fought

25  against so vociferously in this action. Perfect 10, apparently

26  realizing the awkward appearance, confesses that it entered into

27

28                                  91

1 | settlement agreements with several websites after complaining

2 | about infringements of Perfect 10 copyrights. Reply at 13; Zadeh

3 | Decl. II ¶ 13; Mausner Decl. II ¶¶ 8-14. According to these

4 | agreements, the sites would provide for banner advertising as

5 | part of the settlement terms. At the time, Perfect 10 claims it

6 | did not realize the unfair competitive advantage these types of

7 | sites had over its operation. Zadeh Depo. at 310-11.

8 |     The Court finds Perfect 10's basic explanation credible.

9 | Although these agreements do tarnish Perfect 10's crusading

10 | stance, they do not alter the strength of its arguments.

11 | Moreover, Cybernet's argument implies that the best solution to

12 | illicit behavior in an industry that appears to be rife with it,

13 | is to ignore it when the plaintiff appears sullied, too. The

14 | Court finds that there is a strong public interest in protecting

15 | intellectual property rights, and that the better solution is to

16 | bring parties into conformance with the law's dictates. The Court

17 | is also quite cognizant of the harms being inflicted on other

18 | third parties when policies that encourage pirating behavior of

19 | this kind are left unchecked. Although Perfect 10's hands are not

20 | "clean as snow," the Court finds the strength of their case and

21 | the public interest make this issue one better left to trial and

22 | finds it insufficient to justify denying injunctive relief. <u>See</u>

23 | <u>Goto.com v. Walt Disney Co.</u>, 202 F.3d 1199, 1209-10 (9th Cir.

24 | 2000); <u>EEOC v. Recruit U.S.A., Inc.</u>, 939 F.2d 746, 753 (9th Cir.

25 | 1991).

26

27

28                                      92

1 | **VIII.    IRREPARABLE HARM**

2    Cybernet makes three major arguments attacking Perfect 10's

3 showing on the issue of irreparable harm. First, Cybernet invokes

4 the doctrine of laches and argues that this defeats any inference

5 of irreparable harm. Opp'n at 16-17. Additionally, Cybernet

6 maintains that Perfect 10 has failed to establish a sufficient

7 likelihood of success on its claims to entitle it to the

8 presumption of irreparable harm granted to those who make a

9 strong showing of copyright infringement or unfair business

10 practices. Id. at 16. Finally, Cybernet contends Perfect 10 has

11 failed to show irreparable harm. Id. at 17. The Court will

12 address each contention.

13 | **A.    LACHES**

14    Perfect 10 filed its complaint on March 20, 2001, served

15 Cybernet in May, 2001 and filed the present motion on January 7,

16 2002. Cybernet argues that the nine month period from March until

17 January defeats any inference of irreparable harm. Opp'n at 16-

18 17. The Court does not agree. Perfect 10 points to the need for

19 discovery and the stonewalling of Cybernet as reasons for the

20 delay. Reply at 20-21. The Court find these explanations to be

21 adequately supported by the record. They are strengthened by the

22 constant stream of motions in the case, including three motions

23 to dismiss and the multiplicity of theories in the case, which

24 may have reasonably delayed the proceedings. See Tough Traveler,

25 Ltd. v. Outbound Prod., 60 F.3d 964, 968 (2d Cir. 1995). Further,

26 there is no harm to plaintiff from the delay. Cf. Ocean Garden

27

28 |                                        93

1  Inc. v. Markettrade Co., Inc., 953 F.2d 500, 508 (9th Cir.

2  1991)(six months, no laches, no harm to plaintiff). If anything,

3  the gap should have provided Cybernet with sufficient time to

4  evaluate its systems, and put in place a program designed to

5  adequately address its potential liability. The Court thus finds

6  the nine month delay between the filing of the complaint and the

7  filing of this motion is not sufficient to raise the laches bar.

8  Cf. Napster I, 114 F. Supp. 2d at 900 (granting preliminary

9  injunction nine months from the date complaint filed).

10      B.    PERFECT 10'S FAILURE TO SHOW A SUFFICIENT LIKELIHOOD

11            OF SUCCESS

12      In copyright and unfair competition cases, irreparable harm

13  is presumed if once a sufficient likelihood of success is raised.

14  See Micro Star v. Formgen, Inc., 154 F.3d 1107, 1109 (9th Cir.

15  1998)(copyright); Vision Sports, Inc. v. Melville Corp., 888 F.2d

16  609, 612 n.3 (9th Cir. 1989)(unfair competition). Cybernet's

17  contention that Perfect 10 has failed to show a sufficient

18  likelihood of success to raise this presumption must fall as to

19  the claims for which the Court has already concluded otherwise.

20  Thus, irreparable harm may be presumed.

21      C.    EVIDENCE OF PERFECT 10'S IRREPARABLE HARM

22      The Court need not rest on the presumption of irreparable

23  harm, however. Cybernet argues that Perfect 10 has failed to

24  provide any evidence of harm, see Opp'n at 17-18, but the Court

25  finds the record justifies the conclusion that Perfect 10 will

26  suffer irreparable harm. Perfect 10 and Adult Check are

27

28                                94

competitors. Adult Check is the largest AVS on the web and
services approximately 2 million users each day. A significant
number of the sites that attract these users and their funds
utilize Perfect 10's copyrighted works, the images of celebrities
who have complained about the use of their likenesses, or a
combination of both, superimposing celebrities onto the bodies of
Perfect 10's models. These sites charge less than Perfect 10, and
Adult Check appears to contain more of Perfect 10's images than
it owns itself. Cybernet's efforts to show the poor success of
Perfect 10 reinforce this. Perfect 10 loses approximately $4
million to $5 million dollars per year. Just a small shift in the
viewing habits of Adult Check's millions of users would have a
significant effect on Perfect 10's bottom line. All told, the
large losses being sustained by Perfect 10, suffered in this
competitive context, justify a finding of irreparable harm.

### D.   BALANCE OF HARDSHIPS

The Court finds that the balance of hardships weighs
significantly in favor of plaintiff, further justifying a grant
of injunctive relief. Based on the evidence before the Court it
appears that Cybernet profits from the infringing and unlawful
activities of its webmasters without shouldering any of the
undesired burdens associated with protection of intellectual
property rights. The Court finds this willful blindness harms
Perfect 10, defeats the rights of third-parties who find
themselves displayed on these sites against their will, and skews
the online adult market. Perfect 10 has already spent an

95

1  inordinate amount of time researching these infringements, forced

2  to pay a competitor in order to discover the infringing images on

3  the Adult Check system.[36] Cybernet is not only in position to

4  exercise its ability to control the content of the system - it

5  already does when it suits its financial interests. Moreover, the

6  tolerance of pirating behavior by the country's largest AVS

7  system harms the public by rewarding illicit behavior. The

8  balance of hardships favors Perfect 10 and favors injunctive

9  relief.

10      The Court will therefore GRANT Perfect 10's motion for a

11  Preliminary Injunction. The Court does not, however, agree with

12  Perfect 10's proposed terms.

13  **X.   TERMS OF THE INJUNCTION**

14      Although the Court has concluded that Perfect 10 is entitled

15  to injunctive relief, there are goals that must be kept in mind

16  in crafting the scope of relief:

17

18      1)   preventing future infringement;

19      2)   preventing continuing infringement;

20      3)   encouraging the cooperative system envisioned by

21           Congress;

22

23  _____

24      [36]The Court observes that the operations of the Adult Check
    system, with Cybernet's service understandably preventing
25  unfettered access, also works to prevent various intellectual
    property rights holders from effectively protecting their rights.
26  This situation poses a difficult challenge to section 512's
    accommodation of "standard technical measures" where it is
27  unclear that any such standard has been developed.

28                              96

4)   consistency with the statutory framework discussed

above; and

5)   striking the right balance between protecting

intellectual property rights and avoiding unduly

burdensome requirements on Cybernet and its users.


Evaluated against these goals, Perfect 10's proposed order

suffers from some shortcomings. The Court therefore has modified

the proposed injunction. At the hearing, both parties had

questions and concerns over the Court's proposed injunction. The

Court addresses the most salient points now.

During the hearing, Cybernet requested clarification on the

scope of the first paragraph. This first paragraph covers

websites directly operated by the defendants.

Additionally, Cybernet raised several objections to the

Court's imposition of affirmative duties to search through its

system for infringing material. First, Cybernet argued that these

duties require more than the bare minimums of the DMCA. The

injunction does require more than the bare minimum of the DMCA,

but these affirmative duties are justified by the Court's

scepticism that Cybernet can ever qualify for the DMCA's safe

harbor provisions because of the DMCA's vicarious liability

provisions.[37] Moreover, assuming Cybernet may eventually be

---

[37]See supra; A & M Records, Inc. v. Napster, Inc., 2001 WL
227083 *1 (N.D. Cal. 2001)(requiring Napster to use "reasonable
measures" to identify variations in file names)("Napster III");
see also A & M Records, Inc. v. Napster, Inc., - F.3d -, 2002 WL
449550 *1, *4 (9th Cir. 2002)(affirming shut-down order where

97

1    entitled to take advantage of the safe-harbor provisions, the

2    affirmative requirements of the injunction ensure that its prior

3    disregard of copyrights is cured.

4        Second, Cybernet also objected that the injunction overall

5    is too burdensome. The Court disagrees. The injunction simply

6    requires Cybernet to utilize its current site review function to

7    a) remedy past tolerance of infringing activity and b) prevent

8    infringers from joining the Adult Check family. The injunction

9    orders Cybernet to treat copyright protection and respect for

10   rights of publicity as elements of its business model that are

11   equally as important to Cybernet as currently are the color,

12   layout, prevention of certain content, and prevention of over-

13   saturating use of celebrities. It is no more burdensome than the

14   injunction granted in <u>Napster</u>, and falls significantly short of

15   the shut-down order the Ninth Circuit recently upheld. <u>See</u>

16   <u>Napster III</u>, 2001 WL 227081 at *1; <u>Napster IV</u>, - F.3d at -, 2002

17   WL 449550 at *4.

18       Cybernet's argument, however, does have validity in light of

19   Perfect 10's apparent belief that the injunction's terms create a

20   strict liability for <u>any</u> infringing images found on the Adult

21   Check sites. Perfect 10's reading of the injunction is incorrect.

22   Cybernet has an affirmative duty as set out in the injunction,

23   but the Court recognizes that not every violation of copyright or

24

_____

25   Napster "failed to prevent infringement of all of plaintiffs'
     noticed copyrighted works" because "more could be done to
26   maximize the effectiveness of the new filtering
     mechanism") ("<u>Napster IV</u>").
27

28                                    98

1 | rights of publicity will be caught.

2 | Instead, the injunction requires Cybernet's reviewing staff

3 | to take action against sites containing images which a <u>well-</u>

4 | <u>trained</u> site reviewer should catch. The adoption of a DMCA-

5 | compliant plan is meant to ensure the removal of infringing

6 | images that make it through the reviewers' initial screening of

7 | websites. The knowledge requirement goes beyond the DMCA's "red

8 | flag" test, however, because previous enforcement efforts suggest

9 | a strong tendency on Cybernet's part to enforce no more than it

10 | perceives to be the minimal requirements imposed upon it. The

11 | Court may revisit this issue if substantial questions of

12 | compliance with the injunction or burden issues arise, but it

13 | must be stressed that the injunction, like the DMCA, create a

14 | framework where all but the most difficult issues should be

15 | resolvable without the Court's intervention.

16 | Third, Cybernet requested a multi-million dollar bond, but

17 | the Court concludes that a $600,000 bond is sufficient. The only

18 | requirements of the injunction beyond the DMCA's requirements or

19 | Cybernet's current practice of reviewing sites are the imposition

20 | of a single, thorough review of the Adult Check Gold sites,

21 | periodic review of infringing sites, and the training costs for

22 | Cybernet's review staff. Assuming a doubling of Cybernet's

23 | twelve-employee site review staff coupled with proper training,

24 | the Court concludes that such a bond will be sufficient to meet

25 | Cybernet's increased costs. The parties should keep in mind that

26 | the terms of this preliminary injunction may differ significantly

27 |

28 | 99

1 | from the terms of any permanent injunction, should Perfect 10

2 | succeed on its claims. The scope of this order is meant to

3 | address the situation as it now stands, not as it might be after

4 | a trial of the issues.

5 | Finally, the Court has applied uniform standards in

6 | addressing the copyright and right of publicity concerns, despite

7 | the differing sources of the rights, because the Court recognizes

8 | the similar natures of the two rights insofar as technological

9 | limits and notice difficulties inhere in policing their use on

10 | the internet.

11 | **XI.  CONCLUSION**

12 | For the reasons above, Perfect 10's motion for a preliminary

13 | injunction is GRANTED.

14 | It is hereby ordered that during the pendency of this action

15 | and until final judgment is entered, defendants Cybernet

16 | Ventures, Inc. ("Cybernet"), AEI Productions, Inc., Sean Devine,

17 | Funet, Inc., F-T-V Corp., F-T-V.net and Vic Toria and their

18 | agents, servants, directors, officers, principals, employees,

19 | representatives, subsidiary and affiliated companies, assigns,

20 | and those acting in concert with them or at their direction

21 | (collectively, "Defendants") are enjoined as follows:

22 |

23 | 1.  Defendants shall not do any of the following on or in

24 | connection with any websites individually operated by them: (a)

25 | invoke or display the name, likeness or identity of any of the

26 | "Identified Celebrities and Models" (as defined in paragraph 9

27 |

28 |

1  below); or (b) display, copy or distribute any "Perfect 10 Works"

2  as defined in paragraph 11 below) or images substantially similar

3  thereto (collectively, the "Prohibited Content").

4

5      2.    Cybernet shall not include in its search engine or any

6  database any of the Prohibited Content and Cybernet shall not

7  produce any search results of any kind in which the names or

8  identities of the Identified Celebrities and Models are invoked

9  in search requests or queries on its search engine.

10

11     3.    Cybernet shall not permit access to any "Identified

12 Website" (as hereafter defined) via links on Cybernet's website

13 or through the use of an Adult Check ID, nor shall Cybernet

14 otherwise permit an Identified Website to use any of Cybernet's

15 computer facilities unless the Identified Website's owner,

16 operator, or agent registered with Cybernet has complied with

17 counter-notification procedures no less stringent than those

18 found in 17 U.S.C. § 512(g) and the website owner is not an

19 appropriately terminated user under a policy complying with 17

20 U.S.C. § 512(i). Cybernet shall use an identical counter-

21 notification standard for alleged copyright and right of

22 publicity violations. "Identified Website" shall mean any of the

23 following:

24

25         (a) Any Adult Check website that Cybernet knows or has

26 reason to know contains any Prohibited Content (as defined in

27

28                              101

1  Paragraph 10 below), unless the website operator produces Rights

2  Documentation for all Prohibited Content or a counter-

3  notification meeting standards no less stringent than those found

4  in 17 U.S.C. § 512(g).

5

6         (b)   Any Adult Check website identified in Exhibit B to

7  the Third Amended Complaint, unless the website operator produces

8  Rights Documentation for all Prohibited Content or a counter-

9  notification meeting standards no less stringent than those found

10 in 17 U.S.C. § 512(g).

11

12        (c)   Any Adult Check website that Cybernet is given or

13 has been given adequate notice that it contains Prohibited

14 Content, unless the website operator produces Rights

15 Documentation for alleged Perfect 10 Works and any content

16 concerning the Identified Celebrities and Models or a counter-

17 notification meeting standards no less stringent than those found

18 in 17 U.S.C. § 512(g).

19

20     4.   Prior to their addition to the Adult Check network,

21 Cybernet shall review the content of websites to determine

22 whether they contain any Prohibited Content; if the website

23 contains such content and such content is reasonably apparent, or

24 the website specifically disclaims copyright ownership or

25 permission for those images protected by the right of publicity,

26 then it shall not be added to the Adult Check network, unless the

27

28                              102

1  website operator produces Rights Documentation for such content.

2

3      5.    Cybernet shall review on a monthly basis the content of

4  any website that has, at any time, removed content based on right

5  of publicity or copyright allegations without submitting a

6  statement to Cybernet containing at least the information

7  identified in 17 U.S.C. § 512(g), or is operated by a webmaster

8  Cybernet knows or has reason to know has operated a website as

9  described immediately above, in order to determine whether there

10  exists any reasonably identifiable Prohibited Content on that

11  website.

12

13      6.    Within 90 days of entry of this Order, Cybernet shall

14  review the content of each Gold website in order to determine

15  whether there exists on the website any reasonably identifiable

16  Prohibited Content.

17

18      7.    Within 90 days of the entry of this Order, Cybernet

19  shall require that each Adult Check Website in Cybernet's

20  celebrity category produce for Cybernet's inspection, a copy of

21  which shall be served on Perfect 10, Rights Documentation

22  establishing its right to display the images of any person who

23  has lodged a complaint with Cybernet about the use of his or her

24  image on Adult Check affiliated websites. Cybernet shall treat

25  any website as an Identified Website if it fails to produce such

26  documentation for all such content.

27

28                                    103

1        8.    Cybernet shall not include on its website or in

2   promotional materials any statements that the Adult Check

3   websites include images or "fake" images of celebrities for which

4   Cybernet has received notice that the celebrity objects to the

5   use of his or her image unless the reference reasonably reflects

6   content on the websites for which Cybernet can produce Rights

7   Documentation.

8

9        9.    As used here, "Identified Celebrities and Models" shall

10  mean any person who has assigned to Perfect 10 their right of

11  publicity or any person who has complained to Cybernet about use

12  of their images on Adult Check affiliated websites, in so far as

13  these persons are identified in the Third Amended Complaint in

14  this action, or any content concerning such persons, unless

15  Cybernet can produce Rights Documentation that the particular

16  content is authorized. "Identified Celebrities and Models" also

17  shall include any person identified by Perfect 10 in a written

18  statement delivered to Cybernet's designated agent, such written

19  statement for right of publicity allegations directly asserted by

20  Perfect 10 meeting the substantive requirements of 17 U.S.C. §

21  512. "Identified Celebrities and Models" shall also include any

22  new person complaining to Cybernet about the use of his or her

23  images on Adult Check affiliated websites. Cybernet shall make

24  publicly accessible a list of all "Identified Celebrities and

25  Models," identifying their objection to the use of their images

26  on Adult Check affiliated websites.

27

28                                   104

1    10.  As used herein, "Rights Documentation" shall consist of

2  a written license agreement or consent statement, signed by the

3  person or persons whose images or identity is invoked or the

4  person or persons' authorized agent, authorizing the display of

5  the image on Adult Check websites, or a statement, under penalty

6  of perjury, declaring why the website operator believes the

7  display is authorized.

8

9    11.  As used herein, "Perfect 10 Works" shall mean any

10  copyrighted image or work of Perfect 10, or any part thereof.

11

12    12.  Within ten (10) business days of the date of this

13  Order, each of the Defendants shall serve upon plaintiff and file

14  with the Court a report of compliance identifying the steps each

15  has taken to comply with this Order. One hundred days following

16  the date of this Order, Cybernet shall serve upon the plaintiff

17  and file with the Court a further report of compliance

18  identifying the steps it has taken to comply with Paragraphs 6 &

19  7 of this Order.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ////

26  ///

27

28                            105

1     This Order shall be effective upon the filing of a bond in

2 the amount of Six Hundred Thousand Dollars ($600,000) by

3 plaintiff.

4

5 **IT IS SO ORDERED.**

6

7 Dated: *April 22, 2002*

8

9                                    LOURDES G. BAIRD
                                     United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              106