ORIGINAL

ENTERED
ENTR. U. S. DISTRIC. COURT
06-17-02
JUN 17 2002
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

CLERK, U S DISTRICT COURT
JUN 1 4 2002
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

X Priority
X Send
___ Clsd
X Enter
___ JS-5/JS-6
___ JS-2/JS-3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PERFECT 10, INC.,                    )
                                     )      CV 01-02595 LGB (SHx)
              Plaintiff,             )
                                     )
      v.                             )      ORDER DENYING CYBERNET'S
                                     )      *EX PARTE* APPLICATION FOR
                                     )      STAY & *SUA SPONTE* STAYING
CYBERNET VENTURES, INC.,             )      CERTAIN PROVISIONS OF
*et al.*                             )      THE PRELIMINARY
                                     )      INJUNCTION PENDING APPEAL
                                     )
              Defendants             )
                                     )
                                     )
_____)

## I.    FACTUAL AND PROCEDURAL BACKGROUND

     Defendant Cybernet Ventures, Inc. ("Cybernet") has filed an

Ex Parte Application for Stay of Certain Provisions of the

preliminary injunction in this case.[1] In particular, Cybernet

requests a stay as to paragraphs 4, 5, and 6, which ordered

Cybernet to perform a once-over review of the content of its

Adult Check Gold sites, a monthly review of certain websites

_____

     [1]See Order Granting Perfect 10's Motion for Preliminary
Injunction, CV 01-2595 LGB (SHx)(C.D. Cal. April 22, 2002)
("Injunction")

✓ Docketed
✓ Copies / NTC Sent
___ JS - 5 / JS - 6
___ JS - 2 / JS - 3
___ CLSD

256

1   affiliated with a certain sub-section of accused copyright or

2   right of publicity infringers, and a review of all new sites

3   added to the Adult Check network.

4   **II.  LEGAL STANDARD**

5       Federal Rule of Civil Procedure 62(c) provides, in relevant

6   part:

7

8       When an appeal is taken from an interlocutory or final

9       judgment granting, dissolving, or denying an

10      injunction, the court in its discretion may suspend,

11      modify, restore, or grant an injunction during the

12      pendency of the appeal upon such terms as to bond or

13      otherwise as it considers proper for the security of

14      the rights of the adverse party.

15

16      In applying Rule 62(c), the Ninth Circuit has directed

17  district courts to use the same standard that applies to

18  preliminary injunctions. See Tribal Village of Akutan v. Hodel,

19  859 F.2d 662, 663 (9th Cir. 1998). Here two interrelated tests

20  exist for determining the propriety of the issuance of a

21  preliminary injunction.

22      Under the first test, the Court may not issue a preliminary

23  injunction unless:  (1) the moving party has established a strong

24  likelihood of success on the merits; (2) the moving party will

25  suffer irreparable injury and has no adequate remedy at law if

26  injunctive relief is not granted; (3) the balance of hardships

27

28                                      2

1  tips in favor of the movant; and (4) granting the injunction is

2  in the public interest.  See Martin Int'l Olympic Comm., 740 F.2d

3  670, 674-75 (1984); Greene v. Bowen, 639 F. Supp. 554, 558 (E.D.

4  Cal. 1986).  Under the alternative test, a plaintiff must show

5  either (1) a combination of probable success on the merits and

6  the possibility of irreparable injury; or (2) that a serious

7  question exists going to the merits and that the balance of

8  hardships tip sharply in the plaintiff's favor.  See First Brands

9  Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1381 (9th Cir. 1987).

10      The two tests represent a continuum of equitable discretion

11  whereby the greater the relative hardship to the moving party,

12  the less probability of success must be shown. See Regents of

13  Univ. of Calif. v. ABC, Inc., 747 F.2d 511, 515 (9th Cir. 1984).

14  See also Benda v. Grand Lodge of Int'l Ass'n of Machinists, 584

15  F.2d 308, 315 (9th Cir. 1978).

16  III.       ANALYSIS - LIKELIHOOD OF SUCCESS

17      Cybernet makes two basic arguments in favor of a stay.

18  First, it maintains that the injunction's review provisions are

19  too vague and thus raise serious First Amendment concerns related

20  to overbreadth. Ex Parte at 4-8. Second, it argues that novel and

21  serious questions raised by the Court's discussion of the Digital

22  Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, in particular

23  the discussion of the DMCA's counter-notification procedures,

24  justify the stay. Ex Parte at 9-14.

25

26

27

28                                    3

## A.    FIRST AMENDMENT CONCERNS

Cybernet's arguments for a stay based on First Amendment challenges, read most liberally, involve three related attacks. Cybernet first argues that forcing it to search for "reasonably apparent" Prohibited Content results in unconstitutional vagueness in the injunction's terms, which in turn leads to unconstitutional overbreadth in application. Ex Parte at 5. Cybernet also argues that the injunction creates a prior restraint. Id. at 7. Finally, Cybernet's underlying argument is that the injunction will "chill" protected speech. Id. at 4-9.

### 1.    "Vagueness"

Cybernet focuses its argument on the inclusion of language requiring it to determine whether any given site contains "reasonably identifiable" or "reasonably apparent" Prohibited Content. Ex Parte at 5. According to Cybernet, this vague language forces it to be "overinclusive concerning any potentially infringing images or risk the threat of criminal content." Id.

The Court rejects this argument because the "reasonably identifiable" language does not, of its own force, implicate First Amendment concerns. The language Cybernet finds troubling only requires Cybernet to search for and identify potentially infringing images. See Injunction at 102-103. As the Court pointed out in the preliminary injunction order, imposing such an affirmative duty is within the Court's discretionary power. Id. at 97-98.

4

1  consideration.

2      First, it points to a series of measures taken in response

3  to the Court's injunction, including delisting all its celebrity

4  category websites and targeting banner ads on sites in the Adult

5  Check system trumpeting the availability of potentially

6  Prohibited Content on non-Adult Check sites. Long Bui Decl. at

7  21, 35. Presumably these dire results are dictated by the

8  injunction's terms.

9      Cybernet's choice to exceed any requirements found in the

10  injunction (e.g., delisting an entire segment of sites) is an

11  all-or-nothing approach that is not mandated by the injunction.

12  Cf. A&M Records Inc. v. Napster, Inc., 114 F. Supp. 2d 896, 922

13  (N.D. Cal. 2000)("Courts will not sustain a First Amendment

14  challenge where the defendant entraps itself in an "all or

15  nothing" predicament"). Such actions thus have little bearing on

16  the propriety of the injunction's terms.

17      The Court also does not need to address the second category

18  of injunction "problems" mentioned above because the Court has

19  created a framework for squarely presenting the issue to the

20  Court, either through moving to revisiting the scope of the

21  injunction or through the process of providing Rights

22  Documentation for these sites (i.e., why Cybernet believes the

23  content on the sites is somehow authorized) subject to Perfect

24  10's right to petition for an expanded injunction should the

25  present injunction fail to maintain the status quo or prove too

26

27

28                              13

1  porous when combined with Cybernet's DMCA variant.[9] In the

2  absence of argument that these terms actually impact protected

3  speech, the Court finds these latter concerns are insufficient to

4  justify a stay.

5      Cybernet's second argument focuses on fifteen websites, all

6  involving rights of publicity, that it suspects should not have

7  been delisted because they contained protected speech. Long Bui

8  Decl. at 29-35. Of these sites, nine involve situations where

9  Cybernet appears to believe it had specific reason to believe the

10 usage was authorized based on the identified celebrities' lines

11 of work and Perfect 10's limited control over their rights of

12 publicity.[10] See id. Three or four others involve situations

13 _____

14      [9]It should be noted that the injunction did not purport to
   impose a "DMCA-compliant" plan. Rather, the Court presumed that
15 Cybernet would retain some version of its "DMCA variant"
   discussed in the injunction order. See, e.g., Injunction at 60-66
16 (discussing one portion of Cybernet's policy). The Court raises
   this point to clarify a potentially ambiguous statement in the
17 injunction's analysis that was meant to contrast the injunction,
18 which focuses on the initial screening of sites and providing for
   an appropriate termination policy under certain circumstances,
19 with the detailed requirements of the DMCA, which Cybernet has
   claimed was its goal. See Injunction at 99 ("The adoption of a
20 DMCA-compliant plan is meant to ensure  the removal of infringing
21 images that make it through the reviewer's initial screening of
   websites."). The injunction thus imposes a floor on Cybernet's
22 response to potential infringement on sites within the Adult
   Check family, not a ceiling. The parties may revisit its terms
23 should the injunction prove too stringent or too lenient. The
   injunction simply marks an incremental approach to a difficult
24 problem.

25      [10]The Court observes that right of publicity complaints may
26 themselves constitute Rights Documentation if Cybernet identifies
   them as such for individual sites, insofar as the potentially
27 infringing image is argued to fall outside the scope of the

28                                 14

1  where Cybernet appears to believe the uses were constitutionally

2  protected. See id. at 29-31, 33. In none of the fifteen cases

3  does Cybernet claim the website operator was unwilling to submit

4  Rights Documentation, nor does it explain why it would not be

5  willing to state why it might be hesitant to actually claim that

6  these images are proper.[11] See id. at 29-35.

7       Moving beyond the lack of empirical evidence that the

8  injunction exerts a constitutional chill on protected speech,

9  Cybernet contends that webmasters are more likely to pull down

10 content than contest the validity of any challenge to their

11 content. Id. at 35. Leaving aside Cybernet's arguments strongly

12 suggesting that most content provided were more likely to leave

13 the service than submit to such demands, the Court did observe

14 evidence indicating that some webmasters would pull down content

15 in response to Cybernet actions. See Umbreit Decl. at 7-8; see

16 also Long Bui Decl. at 48-65. In an attempt to narrow this class

17 ───────────────

18 complaint.

19      [11]The Court presumes this stems from a fear of potential
   contributory or vicarious liability. To the extent these fears
20 are based on the structure of copyright liability, the injunction
   is not properly the cause of any "chill." Cf. Alfred C. Yen,
21 Internet Service Provider Liability for Subscriber Copyright
   Infringement, Enterprise Liability and the First Amendment, 88
22 Geo. L.J. 1833, 1872 (2000) (arguing for substantive changes in
   copyright law to "reduce the chill associated with ISP vicarious
23 liability"). Cybernet has not attempted to direct its attacks at
   larger game, such as the constitutionality of the entire online
24 vicarious/contributory liability framework or the DMCA. Id. at
   1871-72 (arguing path for Court to more adequately address First
25 Amendment concerns in contexts of general liability principles
   for ISPs), 1888-89 (arguing that DMCA creates First Amendment
26 problems).
27

28                              15

1   down to actual infringers the Court relied on a dual set of

2   observations.

3        First, the Court looked at Cybernet's evidence that it had

4   previously required accused infringers to supply a statement

5   indicating that they had taken down alleged infringing works and

6   would not knowingly post such works in the future. See, e.g.,

7   Long Bui Decl. at 64. These broad statements apparently posed no

8   issues for Cybernet and few issues for its webmasters. The Court

9   therefore concluded that most webmasters who were inclined to

10  remain within the Adult Check system would readily submit the

11  much narrower statement required under the injunction.

12       Additionally, for that limited class that might still opt-

13  out, the Court also included a requirement that any webmaster

14  that had pulled down content would still not be allowed to relist

15  unless it could provide Rights Documentation or a notice at least

16  as stringent as 512(g), thus requiring some indication that the

17  user had believed the use was allowable. See Injunction at 101.

18  This requirement was meant to ensure that there were no

19  incentives to pull down rather than provide a counter-

20  notification, thereby encouraging the exemption of any arguably

21  protected speech from the effect of the injunction through the

22  filing of counter-notifications.

23       Cybernet's examples, out of the approximately 1200 websites

24  it reviewed prior to this ex parte, strongly suggests that the

25  impact of the injunction upon protected expression is minimal, if

26  any. This quantitative impact is reinforced by the qualitative

27

28                              16

1      The identification process in and of itself impacts no

2  content. Moreover, the "reasonably identifiable" language was

3  chosen precisely so that it would provide an incentive for

4  Cybernet to diligently search for potentially infringing material

5  while providing recognition of the difficulties inherent in such

6  a search. Cf. A&M Records, Inc. v. Napster, Inc., 284 F.3d 1091,

7  1096-97 (9th Cir. 2002)(district court preliminary injunction

8  upheld because consistent with holding that defendant must

9  "affirmatively use its ability to patrol its system and preclude

10  access to potentially infringing files listed in its search

11  files"). The language is not vague, requiring identification of

12  "Identified Celebrities and Models" and "Perfect 10 Works." See

13  id. (rejecting similar vagueness arguments). The injunction also

14  provides Cybernet some level of flexibility in approaching these

15  identification duties.[2] Cf. Denver Area Ed. Telecommunications

16  Consortium, Inc. v. FCC, 518 U.S. 727, 752 (1996)(plurality

17  opinion)("the 'reasonabl[e] belie[f]' qualifier, here, as

18  elsewhere in the law, seems designed not to expand the category

19  at which the law aims, but rather, to provide a legal excuse . .

20  . from liability that might otherwise attach").

21      This flexibility is heightened by the Court's removal of

22  images for which Cybernet "can produce Rights Documentation that

23  the particular content is authorized" from its definition of

24

_____

25      [2]This language also provides an incentive for Perfect 10 and

26  others to supply Cybernet with adequate information. The less
information provided, the less likely a given image will be

27  "reasonably identifiable" or "reasonably apparent."

28                                5

1  Identified Celebrities and Models. Injunction at 104. The

2  definition of Rights Documentation is broad, encompassing not

3  just proof that any particular image is allowed but also

4  statements indicating why users believe a display is authorized.

5  Id. at 105. For purposes of clarification, the Court notes that

6  "authorization" is intended to include authorizations by law,

7  such as the "fair use" doctrine of copyright and the

8  newsworthiness exception for rights of publicity. See, e.g., 17

9  U.S.C. § 107 (fair use); Cal. Civil Code § 3344(d)(newsworthiness

10  exception).

11     This definition allows Cybernet to exempt from the

12  injunction's "take down" provisions any site containing images

13  that appear related to rights of publicity *if* Cybernet can

14  produce, in writing, something identifying why it believes the

15  use is authorized.[3] Injunction at 104. Cybernet need not be

16  correct, it need only identify why it believes such use is

17  authorized. Id. at 105. Similarly, with regard to Perfect 10

18

---

19     [3]For purposes of identifying those parties able to provide
Rights Documentation regarding  an "Identified Celebrity or
20  Model," both the individual webmaster and Cybernet are intended
to be recognized as a "website operator" under Paragraph 10
21  insofar as this paragraph relates to Cybernet's search
responsibilities. See Injunction at 103-104 (incorporating
22  Prohibited Content into search duties), 105 (allowing "website
operator" to provide statement explaining why it believes display
23  is authorized). It is only for those images for which Cybernet
opts not to take a stance as to their rights to use a given image
24  that would fall under the take-down and counter-notification
terms of paragraphs 3 and 4. See id. at 101-103 (requiring
25  Cybernet to prevent access through its system for Prohibited
Content unless Rights Documentation or proper counter-notice is
26  produced).
27

28                        6

1  copyrighted works, the definition of Perfect 10 works excludes

2  anything that does not meet a threshold element of copyright

3  infringement. See id. at 105; see also Three Boys Music Corp. v.

4  Bolton, 212 F.3d 477, 481 (9th Cir. 2000)(role of substantial

5  similarity). Even for these works, if Cybernet determines that

6  any given image does not apparently infringe Perfect 10's

7  copyrights, it need not even provide Rights Documentation nor

8  require a counter-notification.[4] Compare id. at 104 (defining

9

10      [4]The differences between the treatment of the two types of
    rights is justified by several factors. First, the Court presumes
11  that the majority of copyright infringements will be caught up
    within the Rights Documentation requirement for Identified
12  Celebrities and Models, thus providing Perfect 10 with
    discoverable notice of potential copyright infringements. See
13  Injunction at 28 (identifying interrelated problems of copyright
    and right of publicity infringement). For those images not
14  potentially coupled to potential rights of publicity violations,
    the Court presumes these images will be both sufficiently
15  identifiable and that Cybernet could not reasonably believe their
    use was directly authorized by Perfect 10. This is based on
16  Perfect 10's absolutist position in this regard, and justifies
    the requirement for some indication from the individual webmaster
17  that the use is authorized for such images by requiring action
    under the notice and take-down provisions. See Injunction at 101-
18  103 (requiring use of procedure). It also explains why Cybernet
    is not provided the opportunity to provide Rights Documentation
19  of its own for such identified examples of copyright
    infringement. See id. at 105 (no Rights Documentation exclusion
20  in definition of Perfect 10 Works).
21
22      It should also be noted that the initial copyright
    provisions in the injunction, see Injunction ¶ 1 at 100, are
23  directed at defendants whose use of Perfect 10 copyrights on
    their own sites is presumed to be egregious based on their
24  defaults and the evidence supplied by Perfect 10. See Injunction
    at 26-27. These parties were enjoined from all use of Perfect
25  10's copyrights during the course of this litigation because of
    their past conduct and because no one raised an objection to this
26  paragraph. Cybernet is encompassed within this section largely

27

28                                  7

1   Identified Celebrities and Models with reference to Rights

2   Documentation) <u>with id.</u> at 105 (defining Perfect 10 Works without

3   reference to Rights Documentation).

4       The Court therefore finds there is little likelihood that

5   Cybernet will succeed in its constitutional attack based on

6   "vagueness."

7               **2.   Prior Restraint**

8       Perfect 10 also resurrects an argument that it broached in a

9   single sentence of its opposition to the preliminary injunction.

10  <u>See</u> Ex Parte at 7; Joint Opp'n to Perfect 10's Motion for

11  Preliminary Injunction, CV 01-2595 LGB (SHx)(C.D. Cal. Feb. 22,

12  2002)("Inj. Opp'n"). There, Cybernet argued that the proposed

13  injunction would operate as a prior restraint, citing <u>Baby Tam &</u>

14  <u>Co., Inc. v. City of Las Vegas</u>, 154 F.3d 1097, 1100 (9th Cir.

15  1998). <u>See</u> Inj. Opp'n at 40. The Court questions whether this

16  single line, fortified by a single footnote, rises to the level

17

18

19  _____

20  because the Court did not perceive an objection to the this
    paragraph, so long as it was applied only to its proprietary
21  websites. <u>See</u> Injunction at 97. The Court realizes, however, that
22  this portion of the injunction threatens contravention of the
    First Amendment by not explicitly providing an exclusion for
23  statutory fair uses. <u>See, e.g., Religious Technology Center v.</u>
    <u>Net-com Online Communication Servs.</u>, 923 F. Supp. 1231, 1258
24  (N.D. Cal. 1995) (recognizing role of fair use in harmonizing
    copyright and the First Amendment). The Court therefore stays so
25  much of paragraph 1 as might prohibit such fair uses and by
    extension of this reasoning applies a similar stay to paragraph
26  2. The right of publicity section is not susceptible to this
    problem and therefore is untouched by the stay.
27

28                                  8

of "argument."[5] See, e.g., Khademi v. South Orange County

Community College District, 194 F. Supp. 2d 1011, 1026 (C.D.

Cal.)("A judge . . . is neither required to hunt down arguments

the parties keep camouflaged, nor required to address perfunctory

and underdeveloped arguments.")(citation omitted); see also

United States v. Lanzotti, 205 F.3d 951, 957 (7th Cir.

2000)(same). This alone is enough to question Cybernet's

likelihood of success on waiver grounds.

Additionally, Cybernet's likelihood of success is

questionable in light of its failure to justify its

classification of the Court's injunction as a prior restraint

without addressing the case law to the contrary.[6] The Court finds

---

[5]The footnote's focus is a single Ninth Circuit case
involving prior restraints. See Inj. Opp'n at 40; see also
Spokane Arcades, Inc. v. Brockett, 631 F.2d 135 (9th Cir. 1980),
aff'd, 454 U.S. 1022 (1981). Cybernet's citations to this case
failed to carry the day for three reasons: 1) Cybernet's failure
to justify analyzing the injunction under the prior restraint
rubric used in Spokane Arcades; 2) Cybernet's failure to
adequately explain how this injunction *impermissibly* shifts
constitutional burdens in light of the Napster decisions; and 3)
Cybernet's failure to indicate how an injunction which actively
encourages webmasters to merely claim that they believe their use
is authorized translates into a requirement of government
approval before a site may join or remain in the Adult Check
family.

[6]See Hill v. Colorado, 530 U.S. 703, 721 (2000)(identifying
copyright violations in content of examples of content-based
determinations that are apparently content-neutral because
related to a course of conduct); Madsen v. Women's Health Center,
512 U.S. 753, 763 n.2 & 765 (rejecting a prior restraint analysis
for restriction impacting speech, discussing injunction
standards); A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004,
1027 (9th Cir. 2001)("We note that First Amendment concerns in
copyright are allayed by the presence of the fair use doctrine");

1    that there is a strong likelihood that the injunction is properly

2    evaluated under the content-neutral standard for injunctions,

3    which requires challenged provisions to burden no more speech

4    than necessary to serve a significant government interest rather

5    than Cybernet's proposed prior restraint analysis. See <u>Sabelko v.</u>

6    <u>City of Phoenix</u>, 120 F.3d 161, 164 n.2 (9th Cir. 1997).

7       Beyond Cybernet's low likelihood of success in justifying

8    its choice to analyze the injunction under the prior restraint

9    framework, Cybernet also has a low likelihood of success because

10   of its failure to establish that the injunction would operate to

11   restrict access to or reduce the amount of information available

12   to the general public. See <u>Hill v. Colorado</u>, 530 U.S. at 734

13   (rejecting prior restraint argument because "absolutely no

14   channel of communication is foreclosed. No speaker is silenced.

15   And no message is prohibited."). Cybernet's direct control over

16   participating websites is limited to disabling their use of Adult

17   Check's script. <u>See, e.g.</u>, Cybernet Ten-Day Report at 9; Long Bui

18   Decl. at 18 n.1. It cannot reach the content on a webmaster's

19   site. <u>See</u> Long Bui Decl. at 18. Thus, delisting a site actually

20   increases the availability of information to the general public,

21   at least initially, because it takes down Adult Check's walls to

22   the public. <u>See</u> Injunction at 13 (describing Adult Check's

23   service).

24

25   <u>Michaels v. Internet Entertainment Group, Inc.</u>, 5 F. Supp. 2d

26   823, 838-39, 843 (C.D. Cal. 1998)(imposing injunction partially-
     based on right of publicity injunctions after tailoring the scope

27   of the injunction).

28                             10

1    Moreover, Cybernet argued strenuously that its webmasters

2  would simply move to a competitor rather than tolerate any

3  attempts to control their content. See, e.g., Joint Opp'n at 3,

4  12-13; Lane Decl. at 16-17. Under either scenario, delisting or

5  switching services, the level of content available to the general

6  public provided by an individual webmaster remains stable.[7]

7  Cybernet has failed to adequately explain how such a result

8  constitutes a "prior restraint."[8] The Court thus finds little

9  likelihood of success for Cybernet's prior restraint arguments.

10        **3.   Overbreadth**

11    Cybernet initially qualified its single sentence of argument

12  in its opposition by restricting its application "to the extent

13  the injunction reaches the protected expression of Cybernet and

14  its customers." Inj. Opp'n at 40. Now Cybernet elaborates on this

15  argument, attempting to establish a high likelihood of success on

16  its underlying contention that the injunction is overbroad. Ex

17  Parte at 4-9. In evaluating this argument, the Court keeps in

18

19        [7]Cybernet has also failed to adequately justify its
   assertions that the availability of protected speech would be
20  reduced as a result of the injunction. This argument will be
   dealt with separately. See infra.
21

22        [8]Even for those images that might fall within the take-down
   provisions of the injunction, the Court does not require the
23  operators to establish that they are in fact authorized to use
   such content or get any approval from the Court. Rather, it is
24  enough to simply assert a belief in authorization. At that point
   it becomes Perfect 10's ultimate responsibility to act. In not
25  adding the DMCA's requirement that a service provider take down
   such sites upon the complainant's notification that it will file
26  a lawsuit, the floor provided by the injunction actually protects
   more expression than the DMCA.
27

28                              11

1  mind the significant government interests the injunction

2  protects, including protecting Perfect 10's copyright and unfair

3  competition rights from irreparable harm and maintenance of the

4  status quo during the pendency of this action. See Injunction at

5  94-96.

6      Cybernet argues that the injunction impacts its protected

7  speech as well as that of its webmasters. See Ex Parte at 7.

8  Moreover, it argues that the overly broad terms of the injunction

9  create a chill over these exercises in constitutionally-protected

10  expression. See Ex Parte at 5-7; Long Bui Decl. at 21, 24-25, 29-

11  35.

12      The record before the Court at the preliminary injunction

13  hearing strongly suggested that this problem would prove to be

14  minimal, and in fact was nothing more than a throw-away line.

15  Compare Injunction at 65-66, 82-83 (credibility concerns) with

16  id. at 3, 10-13 (stressing independence of webmasters). Not only

17  did the Court understand Cybernet as not objecting to the first

18  paragraph so long as the paragraph was properly limited (nor does

19  Cybernet object now), but it has consistently distanced itself

20  from any message promulgated by its independent webmasters. Joint

21  Opp'n at 10 ("Cybernet has . . . no control over the content

22  [webmasters] elect to use on their site"). Nevertheless, the

23  Court expressed its willingness to revisit this question should

24  Cybernet's later experiences prove this view erroneous. See

25  Injunction at 99. In its Ten-Day Report and in moving for the

26  stay, Cybernet has raised two points for the Court's

27

28                          12

1  difference between Perfect 10's examples of alleged infringement,

2  many of which were blatant, and Cybernet's identified sites,

3  including Cybernet's suggestion that rights documentation is

4  readily available. Further, Cybernet's failure to suggest that

5  any of the sixty celebrity websites that have been re-admitted to

6  Adult Check since the injunction took effect have deleted images

7  that were likely to be protected expression further weakens its

8  position. See Long Bui Decl. at 27.

9      The Court has considerable concerns about ensuring the

10  injunction does not cross First Amendment barriers, particularly

11  given the challenges posed by the "lightning speed development of

12  the Internet," See Name.Space, Inc. v. Network Solutions, Inc.,

13  202 F.3d 573, 584 & n.14 (2d Cir. 2000). The Court recognized

14  this in the injunctive order and continues to recognize that:

15

16      Given the potential costs of categorical decisions in

17      the absence of perfect foresight, and the amorphous and

18      malleable nature of First Amendment doctrine, there is

19      reason to believe that a 'decision involving the

20      application of the First Amendment to new

21      communications technologies, including the Internet

22      should be narrow, because a broad decision rendered at

23      this time [may be error].'

24

25  See id. at 584 n.11 (quoting Cass R. Sunstein, The Supreme Court,

26  1995 Term-Foreword: Leaving Things Undecided, 110 Harv. L. Rev.

27

28                                17

1  4, 18 (1996). Nevertheless, the Court does not believe Cybernet

2  has adequately shown that the injunction or its incremental

3  approach will burden more speech than necessary to protect

4  Perfect 10's rights against copyright infringement and unfair

5  competition. The Court therefore denies the request for a stay

6  based on overbreadth concerns.

7      **B.   Novel and Serious Questions Under the DMCA**

8      In addition to the constitutional argument above, Cybernet

9  argues that the Court may have committed error in inferring

10  significance from the DMCA's counter-notification requirements,

11  which require a "statement under penalty of perjury that the

12  [accused] subscriber has a good-faith belief that the material

13  was removed or disabled as a result of mistake or

14  misidentification of the material to be removed or disabled." See

15  Ex Parte at 9-14. Perfect 10 correctly points out that this

16  entire argument is  beside the point. Opp'n to Ex Parte at 8-9.

17  The Court determined that it is unlikely Cybernet will be able to

18  avail itself of the DMCA's safe harbors based on the safe

19  harbors' vicarious liability exclusion and Cybernet fails to

20  challenge that portion of the ruling. Injunction at 74, 97.

21      Furthermore, the Court's discussion of sections 512(g) and

22  (i) was directed more at providing Cybernet with guidance as to

23  the Court's expectations concerning compliance with the

24  injunction. See, e.g., Injunction ¶ 3, at 101 (incorporating

25  statutory provisions). Cf. Religious Technology, 923 F. Supp. at

26  1258 (in context of copyright injunction, noting "copying the

27

28                                  18

1  works in their entirety with very little added criticism is

2  almost certainly not fair use"). In crafting the injunction, the

3  Court opted to draw inspiration from the DMCA - as it was raised,

4  although not briefed in any depth, by Cybernet - in an effort to

5  strike the right balance between protection of expression and

6  protection of the intellectual property rights raised in this

7  case. See Injunction at 97-99.

8      The Court did so in an effort to protect Cybernet from the

9  strict terms of Perfect 10's proposed injunction. Although

10  Cybernet's then-current policy alone was unlikely to prevent

11  further irreparable harm, the scale of rights infringement,

12  although likely large in absolute terms and likely compounded by

13  Cybernet's culpability, is also likely to be a far cry from the

14  scale of copyright infringement involved in the Napster case. The

15  injunction provides a way to ensure that aggrieved webmasters do

16  not unduly proliferate infringing material on Adult Check's

17  service, while creating a record to ensure Cybernet accepts its

18  fair share of the burden in policing its network, further

19  identifying the scope of infringing activity, and also

20  facilitating the monitoring of the injunction.

21      The Court made no pronouncements as to the exact

22  requirements of section 512(g), but rather identified perceived

23  problems with Cybernet's implementation of the section. See

24  Injunction at 69-70. This was necessitated by Cybernet's failure

25  to adequately address any of the DMCA's provisions in its

26  opposition, combined with the flaws in Perfect 10's proposed

27

28                              19

1  injunction. The Court turned to the DMCA as a gap-filler in

2  crafting the injunction and its discussion of individual

3  statutory sections not directly related to points raised by the

4  parties should be understood in those terms.

5      In arguing for a stay, Cybernet states:

6

7      interpretation and application of the DMCA is not an

8      open and shut question in this case. There are serious

9      questions about what is required, which, in turn, has

10     serious ramifications in any assessment of Cybernet's

11     performance of its compliance obligations.

12

13 Ex Parte at 14.

14     Leaving aside Cybernet's failure to address these "serious

15 questions" in its earlier conclusory briefing, what Cybernet

16 fails to do is identify any legal errors that might impact the

17 terms of the injunction's paragraphs four, five, and six. See

18 Injunction ¶¶ 4-6, at 102-103. These are the only paragraphs for

19 which Cybernet brings an objection. As mentioned previously, the

20 Court's conclusion that Cybernet must review the selected

21 categories of websites operates entirely outside the framework of

22 the DMCA. See supra.

23     Even addressing Cybernet's focus on the injunction's

24 invocation of section 512(g)'s counter-notification requirements

25 the argument for a stay fails. Ex Parte at 10-14.  In the

26 injunction there are three distinct references to 512(g)

27

28                          20

1    referenced, directly or indirectly, in these paragraphs.

2       First, the injunction requires Cybernet to review websites

3    that have, at any time, "removed content based on right of

4    publicity or copyright allegations without submitting a statement

5    to Cybernet containing at least the information identified in 17

6    U.S.C. § 512(g)." <u>See</u> Injunction ¶ 5, at 103. This requirement

7    has very little to do with the counter-notification requirements

8    of the DMCA and everything to do with the Court's suspicion that

9    Cybernet's "DMCA policy" allowed repeat and willful infringers to

10    remain on its service. <u>See</u> Injunction at 65-66, 69-70. Requiring

11    Cybernet to revisit these sites ensures that any such infringers

12    will be revealed.

13       The Court's concerns over the potential for Cybernet to use

14    its "take down compliance" counter-notification to avoid

15    addressing repeat infringers receives confirmation in Long Bui's

16    Declaration. In their Ten-Day Report, Cybernet supplies evidence

17    that its associate general counsel threatened to delist one of

18    the named defendants in this case on July 25, 2001. Ten-Day

19    Report, Ex. 45.   The webmaster's agent, Steven Farber, responded

20    with a statement, under penalty of perjury, that the infringing

21    images were taken down. <u>Id.</u> On December 28, 2001, Cybernet sent

22    out another 37 DMCA notices for alleged infringement on various

23    websites associated with this webmaster. Long Bui Decl. at 69-81.

24    Cybernet received take-down statements for only twenty-five of

25    the thirty-seven sites. <u>See</u> <u>id.</u> Nevertheless, these twenty-five

26    were then put back on the system. <u>See</u> <u>id.</u> This example reveals a

27

28                      21

1  tolerance for infringement in Cybernet's DMCA variant that

2  apparently exceeds its "ask for certification, but don't verify"

3  policy in place before it adopted this variant.

4      The Court's concerns over situations like the one above also

5  explain an apparent redundancy in the injunction. Websites that

6  provide either Rights Documentation or a section 512(g) counter-

7  notification are not considered Identified Websites. <u>See</u>

8  Injunction ¶ 3, at 101-102. As Cybernet implicitly recognized in

9  its opposition, some sites *might* opt to take down their content

10 rather than respond to allegations of infringement.

11     By requiring a form of counter-notification as a condition

12 for allowing a user back on the system, the injunction encourages

13 webmasters to challenge rather than acquiesce in "take down

14 notices." <u>See</u> <u>supra</u>. Additionally, this works to screen out

15 willful infringers.  In the absence of any indication that

16 Cybernet was taking steps to address either willful or repeat

17 infringers, the Court's injunction presents a procedure designed

18 to address this gap, above and beyond the requirements of the

19 DMCA. Thus, the Court's invocation of section 512(g)'s perceived

20 requirements is again an exercise of the Court's discretion in

21 crafting the injunction, and the Court's observations do not

22 constitute a final interpretation of the DMCA itself.

23     Similar considerations apply to the Court's discussion of

24 section 512(i) insofar as that discussion went beyond the

25 conclusion that the DMCA was unlikely to apply to Cybernet's DMCA

26 variant. <u>See</u> Injunction at 59-66.

27

28                          22

1    This leaves the question whether requiring accused
2  infringers to provide a statement no less stringent than that
3  required in section 512(g) somehow infects the injunction with
4  error sufficient to justify a stay. See Injunction ¶¶ 4-6, at
5  102-103 (Cybernet's objectionable terms); Ex Parte at 10-14
6  (arguing for error). Cybernet's argument that there is error
7  lurking in the Court's tentative understanding of section 512(g)
8  focuses solely on the Congressional intention in crafting these
9  terms. See id.

10    According to Cybernet, the counter-notification requirements
11  of the DMCA have no use in determining whether or not a
12  particular user is an appropriately terminated infringer, or at
13  least were not intended to have such use. See Ex Parte at 13-14.
14  Whatever the merits of this view, the Court's consideration of
15  512(g) (and the section's incorporation into the injunction) was
16  dictated by the need to protect Perfect 10 from irreparable harm.
17  The Court found that Cybernet's version of section 512(g)'s
18  counter-notification was unlikely to prevent that harm.
19  Injunction at 69-70. This conclusion was one of fact.

20    Combining this conclusion with the Court's conclusion that
21  the DMCA simply does not apply to Cybernet, see Injunction at 97,
22  any error in attempting to parse out the DMCA as a guide to the
23  injunction operated in Cybernet's favor, preventing it from
24  working under a more draconian framework. Cybernet has failed to
25  show how this error, if such it is, is sufficient to justify a
26  stay, particularly of the provisions requiring Cybernet to review
27
28                              23

various sites. <u>Cf.</u> <u>Napster</u>, 2001 WL 227083 (N.D. Cal. 2001)(imposing a stricter regime); <u>see also</u> <u>Napster</u>, 284 F.3d at 1098 (upholding "zero tolerance" standard).

For the reasons above, the Court concludes that Cybernet's arguments based on "serious and novel" questions of law fails to show a likelihood of success sufficient to justify staying the objected to portions of the injunction. <u>See</u> Injunction ¶¶ 4-6, at 102-103.

**IV.   ANALYSIS - OTHER FACTORS INFLUENCING DECISION TO STAY**

Cybernet makes no independent arguments directed at the other elements required to justify a stay. These factors thus also weigh against a stay.

**V.   CONCLUSION**

Cybernet's ex parte application fails to establish the appropriateness of staying the objected to portions of the injunction, <u>see</u> Injunction ¶¶ 4-6, on the grounds of First Amendment overbreadth or the "serious and novel" questions of law raised by the Court's preliminary injunction order. The Court therefore DENIES the ex Parte application for a stay of those provisions.

///
///
///
///
///
///

1      At the same time, the Court *sua sponte* STAYS the first two

2  paragraphs of the injunction, Injunction ¶¶ 1,2, at 100-101,

3  insofar as they might be read as forbidding fair uses of Perfect

4  10 Works.

5

6

7  **IT IS SO ORDERED.**

8  Dated:    *June 12, 2002*

9                                             LOURDES G. BAIRD
                                             United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                  25